**John DOE, et al.**

v.

**CITY OF MINNEAPOLIS.**

Civ. No. 4–88–475.

United States District Court,
D. Minnesota,
Fourth Division.

Aug. 19, 1988.

Randall D.B. Tigue, Minneapolis, Minn., for plaintiffs.

C. Lynne Fundingsland, Minneapolis, Minn., for defendant.

## ORDER

ROSENBAUM, District Judge.

The city of Minneapolis, Minnesota, has enacted an ordinance requiring the removal of viewing booth doors in adult bookstores. Such viewing booths are utilized by patrons for observing movies, videos, or live dancing. Plaintiffs challenge the constitutionality of the ordinance. They bring this action under 42 U.S.C. § 1983 seeking declaratory and injunctive relief against the City of Minneapolis. Jurisdiction exists under 28 U.S.C. §§ 1343 and 1331.

Plaintiffs commenced this action on June 3, 1988. Four days later, a hearing was held on plaintiffs' request for a temporary restraining order (TRO). An order was issued, temporarily preventing defendant from enforcing the challenged ordinance.[1]

Pursuant to order of the Court and agreement of the parties, plaintiffs' motion for a preliminary injunction was consolidated with trial on the merits, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure (Fed.R.Civ.P.). Trial was held on June 15, 1988. Upon completion of trial, the matter was taken under advisement and the TRO extended until final determination.[2]

The Court has heard and considered the evidence presented at trial, as well as the arguments, pleadings, and memoranda of each party. This order constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 52(a), Fed.R.Civ.P.

### The Parties

Plaintiff John Doe [3] claims himself to be an habitue of adult bookstores and their movie and dance viewing booths. Plaintiff Timothy Campbell (Campbell) is a prominent member of the Minneapolis gay community and is presently an occasional patron of adult bookstores. Campbell indicates his tastes in adult video entertainment are diverse, encompassing both hetero- and homosexually oriented videos. Plaintiff Ferris Alexander (Alexander) is the owner-proprietor of a number of adults-only bookstores in Minneapolis. Each plaintiff is a citizen of the State of Minnesota.

Defendant City of Minneapolis is a municipal corporation organized under the laws of the State of Minnesota, with authority to enact municipal ordinances. *See* Minnesota Statutes, § 412.191, subd. 4.

### Findings of Fact

There are eight adults-only bookstores operating within the Minneapolis city limits. The bookstores offer a diverse collection of sexually oriented reading and viewing materials. The constitutionality of the display of these materials, per se, is not at issue in this proceeding. Six of the eight bookstores are owned and operated by

---

1. The Court issued the TRO from the bench at the hearing. A written order was filed on June 10, 1988.

2. On July 5, 1988, the Court, upon defendant's request, amended the TRO. Under the amended TRO, defendant City of Minneapolis has been permitted to enforce the ordinance against all commercial establishments except those adult entertainment facilities which provide booths for viewing films, motions pictures, video tapes, or live dancing.

3. The complaint states that "John Doe" is prosecuting this action by means of a pseudonym, "in order to protect himself from harassment, injury, ridicule, or personal embarrassment." Complaint, p. 1.

plaintiff Alexander. These bookstores are commercial establishments open to the adult public.

Each of plaintiff Alexander's Minneapolis bookstores house coin-operated "booths" offering viewing entertainment for its patrons. These booths provide to the viewer a choice of either video entertainment or a live dance performance. In a video booth, a patron may select and view one of a number of possible offerings, the names of which are displayed on a marquee card outside the booth's door. The video's title and the marquee text suggest the type or orientation of the fare available for viewing. In a dance booth there is a viewing window having an opaque covering. Upon deposit of coins, the patron may secure the removal of the covering and observe, for a few moments, a stage upon which an ecdysiast pursues her terpsichorean muse.

There are 125 [4] such booths in plaintiff Alexander's bookstores. Of these, all but six [5] are "single person" booths measuring approximately three feet by three feet in size. Each booth has a full length opaque door which closes and locks.

Adult bookstores are presently subject to a Hennepin County District Court order prohibiting occupancy of individual booths by more than one person.[6]

On April 1, 1988, the Minneapolis City Council (council) enacted Minneapolis Ordinance, §§ 219.500–219.530 (ordinance) [7], which was signed into law by the mayor of the City of Minneapolis on April 7, 1988. The ordinance seeks to diminish the spread of contagious diseases caused by "high risk sexual conduct." It attempts to do so by regulating certain commercial facilities where high risk sexual conduct has been found by the council to have taken place. The ordinance is, by its terms, a health, safety, and welfare regulation.

The council, in enacting the ordinance, was particularly concerned with Acquired Immune Deficiency Syndrome, commonly known as AIDS. AIDS is a sexually transmitted disease.[8] In arriving at its factual findings, the council held public hearings and compiled a record of live testimony, affidavits, and medical evidence concerning AIDS. The council considered AIDS's rapid spread here and in other parts of the country, its incurable, fatal nature, and its sexual mode of transmission. The council received evidence showing that high risk sexual activity contributes to the transmission of AIDS. The council examined evidence that high risk sexual activities including multiple, anonymous sexual encounters and casual sexual activity occurred in the types of commercial establishments sought to be regulated. The evidence at trial supports the council's finding that multiple, anonymous sexual encoun-

---

**4.** This number includes the booths in a store owned by Alexander located in St. Paul, Minnesota.

**5.** These six booths are large screen or theater booths, which are approximately six feet by six feet in dimension. The large screen booths are located at four of Alexander's bookstores—two stores with one large screen booth each, and two stores with two large screen booths.

**6.** On September 1, 1982, a Hennepin County District Court issued an order granting a permanent injunction in the case of *Henningsgard, et al. v. Bouza, et al.*, No. 761468, slip op. (Hennepin County District Court September 1, 1982). The order provides, in part, that adults-only bookstores:

Post conspicuously and make reasonable efforts to enforce their policy of prohibiting the occupancy of individual viewing booths by more than one (1) person (the sole exception shall be booths designed for wide-screen viewing).

*Id.*, at 2. The order also directed adult bookstores to:

Prohibit, prevent, locate and repair within a period of 48 hours any apertures in any viewing booth or between viewing booths.

*Id.*, at 2.

**7.** The Minneapolis ordinance is patterned upon a similar ordinance in Marion County, Indiana.

**8.** AIDS is also contracted by other means, but it is clear that exchange of bodily fluids, primarily by sexual means, is the favored method of viral transmission. The undisputed testimony at trial indicates that anal intercourse is the principal means of AIDS transmission. Plaintiffs introduced medical evidence indicating a lower risk of infection through oral sex. The Court finds that while oral sex may provide a lower risk for transmission of AIDS, it remains a risk which cannot be discounted.

ters, including fellatio and anal intercourse, facilitate the spread of AIDS.

The council has found that certain commercial establishments, by their design or use, permit high-risk sexual conduct. The regulated establishments contain "booths, stalls, or partitioned portions of a room or individual rooms" including viewing booths which, for a fee, offer movies or other entertainment for viewing within the booth. The ordinance requires the removal of doors, curtains, or other obstructions so that at least one side of the booth is open to an adjacent public room and is visible to persons in the public room. The coin-operated viewing booths maintained by plaintiff Alexander and patronized by plaintiffs Doe and Campbell fall within the purview of the ordinance.

The Court finds the evidence corroborates the council's finding that sexual activity of the type sought to be regulated takes place in the bookstore viewing booths. The most compelling evidence on this point was given by plaintiff Campbell who testified [9] that while the most common form of sexual activity in such booths was mutual masturbation, both fellatio and anal intercourse took place. According to Campbell fellatio was more frequent than anal intercourse, the latter being made more difficult by the booth's small size.

His statements were confirmed by the testimony of Dean Severson (Severson), a Minneapolis police officer, who has observed such activity in the past, and by the anecdotal testimony of Dr. Margaret Simpson whose practice extensively focuses on AIDS victims. Dr. Simpson, whom the Court finds to be an expert in this field, related that such encounters have been regularly reported by her patients. Rule 703, Federal Rules of Evidence.

Evidence, of an arguably contrary nature, was given by Nhon Lam, the manager-clerk of defendant Alexander's bookstores. He testified that occupancy of a booth by more than one person is proscribed both by the *Henningsgard* injunction, referred to above, as well as by signage prominently displayed in the bookstores. He testified that the bookstores utilize surveillance video cameras to assure compliance. In addition, Eve White, a dancer employed as a viewing booth performer, testified that on those occasions when she observes more than one person in a viewing booth, she presses a buzzer which summons assistance. The person called, she testified, removes the second person from the booth.

It is notable that both the bookstore manager's and Eve White's testimony corroborates the fact that there did occur periods when more than one person occupied a booth. The question then devolves into a consideration of the nature of the activity therein. In this regard, the Court credits the testimony of Campbell, Severson, and Dr. Simpson, and finds that high risk sexual activity does occur in the closed viewing booths.

Plaintiffs Campbell, by testimony at trial, and Doe, by affidavit, state that removal of the doors from the viewing booths will have a chilling effect on their willingness to patronize adult viewing booths. Plaintiff Alexander claims that viewing booth door removal will cause a precipitate loss in his revenues. In support of his claim Alexander presented the testimony of James Hafiz, president of Beverly Theatre and operator of the Faust Theater in St. Paul. Hafiz testified that during a period when he was required to remove the doors from the viewing booths at his theater [10] he ex-

9. Plaintiff Campbell also described bookstores, and the hemophilic and homophobic activities which occur therein, as a recognized component of gay culture. In his testimony, he spoke passionately of the burdens imposed by his lifestyle and inclinations. He spoke of harassment, derision, physical danger, and abuse. These are necessarily matters of concern in the diverse culture of a city, but cannot form a basis for decision in this lawsuit.

10. The city of St. Paul, Minnesota, enacted an ordinance requiring the removal of viewing booths doors in 1987. A suit, *Bartone v. City of St. Paul*, Civil No. 4–87–699 (D.Minn.1987), was filed in this Court challenging the ordinance. The case was resolved by a stipulation providing for a one person per booth occupancy rule and requiring that the doors to the booths be cut off at least 24 inches from the floor. The period to which Hafiz testified was a one week interval

perienced an almost 65% reduction in viewing booth revenue; if the door ban had remained in effect, Hafiz stated he could not have continued to operate his business.

Michael Rayer, a legal investigator for the Hennepin County Attorney's Office, testified that on June 10, 1988, he visited a St. Paul bookstore in which the viewing booths had cut-off doors. During his investigation he observed two men enter the same booth, and, notwithstanding the 24 inch opening, observed the men in what appeared to be sexual activity.

### Discussion and Conclusions of Law

Plaintiffs attack the constitutionality of the ordinance on several grounds. First, plaintiffs claim the ordinance infringes their constitutional rights of free speech and privacy under the first and fourteenth amendments. In this regard, plaintiffs Campbell and Doe contend the ordinance has a substantial chilling effect on their asserted right to view motion picture films and live dance entertainment in the mode and style of their choice; plaintiff Alexander claims the ordinance deprives him of the ability to disseminate protected speech by making it economically infeasible to engage in first amendment activities. Second, plaintiffs assert the ordinance to be unconstitutionally overbroad. For their third contention, plaintiffs argue the ordinance deprives them of equal protection of the law as guaranteed by the fourteenth amendment. Each of these grounds will be analyzed in turn.

As a preliminary matter, the Court notes the City of Minneapolis does not assert the films or live dancing exhibited at the adult bookstores to be obscene.[11] Therefore, the Court presumes the materials in question are afforded first amendment protection.[12] *Wall Distributors,* 782 F.2d at 1168; *Ellwest,* 681 F.2d at 1245.

■ The Court recognizes a bookstore operator's first amendment right to display sexually explicit but non-obscene films. Likewise, patrons of adult bookstores have a protectable first amendment right to view sexually explicit but non-obscene films and live dance entertainment. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 756, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976) (where a speaker exists ... the protection is afforded to the communication, to its source and recipients both); *Basiardanes v. City of Galveston,* 682 F.2d 1203, 1211 (5th Cir.1982).

Plaintiffs first argue the door removal requirement substantially abridges their first amendment rights to exhibit and to receive constitutionally protected speech. They further argue their right to privacy is violated by the open door requirement.

■ The Supreme Court has long held that regulations enacted for the purpose of restraining protected speech because of its content presumptively violate the first amendment. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986). At the same time, however, it is well settled that protected first amendment speech may be subject to time, place, and manner restrictions "if sufficiently justified and narrowly enough drawn." *Wall Distributors,* 782 F.2d at 1168; *see Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293,

---

between enactment of St. Paul's ordinance and the lawsuit's settlement.

**11.** It is well established that the obscene materials are not protected speech within the meaning of the first amendment and as applied to the states under the fourteenth amendment. *Ginsberg v. New York,* 390 U.S. 629, 635, 88 S.Ct. 1274, 1278, 20 L.Ed.2d 195 (1968); *Ellwest Stereo Theatres, Inc. v. Wenner,* 681 F.2d 1243, 1245 (9th Cir.1982). Sexually explicit but non-obscene materials, however, are "entitled to no less protection than other forms of expression." *Avalon Cinema Corp. v. Thompson,* 667 F.2d 659, 663 (8th Cir.1981) (citing *Young v. Ameri-*

can Mini Theatres, 427 U.S. 50, 73, 96 S.Ct. 2440, 2453, 49 L.Ed.2d 310 (1976)); *see Wall Distributors, Inc. v. City of Newport News, Va.,* 782 F.2d 1165, 1168 (4th Cir.1986).

**12.** Sexually explicit films exhibited by coin-operated peep-show devices such as video booths have been found to be protected by the first amendment. *See, e.g., Hart Book Stores, Inc. v. Edmisten,* 612 F.2d 821 (4th Cir.1979), *cert. denied,* 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980). Live nude dance entertainment is also protected expression under the first amendment. *Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981).

104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968).

This ordinance does not regulate the content of the films or live entertainment viewed by patrons in the booths of adult bookstores. The prohibition as to closed-door booths would apply to a showing of "Rebecca of Sunnybrook Farm" as well as any other film or performance. The ordinance regulates only the non-communicative aspects relating to the environment in which such material may be disseminated or received, and thereby "imposes only an incidental burden" on plaintiffs' first amendment rights. *See Wall Distributors,* 782 F.2d at 1168; *see, e.g., Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 106 S.Ct. 3172, 3176, 92 L.Ed.2d 568 (1986).

▮ The question here is "whether the incidental burden imposed by this restraint on the manner of dissemination [and receipt] of protected speech is nevertheless sufficiently intrusive on the basic right that it runs afoul of first amendment protec-

tions." *Wall Distributors,* 782 F.2d at 1169.

To sustain a time, place, and manner restriction on First Amendment activities, the [City of Minneapolis] must show that the restriction (1) is content-neutral, (2) serves a legitimate governmental objective, (3) leaves open ample alternative channels of communication, and (4) is narrowly tailored to serve the governmental objective.

*City of Watseka v. Illinois Public Action Council,* 796 F.2d 1547, 1552 (7th Cir.1986), *aff'd,* 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed. 2d 972 (1987).[13,14]

The first criterion of the *Watseka* test is easily satisfied; all parties agree the ordinance is content-neutral.

As to the second element, the City of Minneapolis claims the ordinance serves a public health purpose—impeding the spread of AIDS in Minneapolis. The Minneapolis City Council has the responsibility of promoting the health of its citizens, and of taking steps to prevent and suppress disease in Minneapolis.[15] Minneapolis

---

**13.** The City of Minneapolis, as the proponent of an ordinance which allegedly infringes upon first amendment rights, has the burden of showing the ordinance is constitutional. *City of Watseka,* 796 F.2d at 1551; *ACORN v. City of Frontenac,* 714 F.2d 813, 817 (8th Cir.1983).

**14.** The test for a time, place, and manner restriction has been stated somewhat differently by other courts. In *Wall Distributors* the Fourth Circuit, quoting the Supreme Court in *U.S. v. O'Brien,* set forth the test as follows:

Such a manner restriction is valid: "[1] if it is within the constitutional power of the Government; [2] if it furthers an important governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on ... First Amendment freedoms is no greater than is essential to the furtherance of that interest."

*Wall Distributors,* 782 F.2d at 1169 (quoting *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1697).

Recent decisions of the Supreme Court and the Eighth Circuit appear to favor the *Watseka* test. *See City of Renton,* 106 S.Ct. 925; *City of Watseka,* 796 F.2d at 1552–3; *Upper Midwest Booksellers v. City of Minneapolis,* 780 F.2d 1389 (8th Cir.1985). In light of these decisions this Court will follow the *Watseka* test. However, because plaintiffs raise issues concerning the relationship between the government's interest and the claimed suppression of free expression, the

Court will also address the third prong of the *O'Brien* test.

**15.** Chapter 14 of the Minneapolis Charter creates a Department of Public Welfare. Under Chapter 14, a Board of Public Health was established and granted both general and special powers. Section 3, regarding the duties of the board, provides in part:

To take such measures as the Board may in good faith declare the public safety and health to demand in case of pestilences or epidemic diseases or all danger from anticipated or impending pestilences or diseases or in case the sanitary conditions of the City shall be of such a character as to warrant it.

To direct the Commissioner of Health to inspect any part of the city which from its location or from any collateral circumstances may be deemed the cause of diseases and in all cases where the Commissioner may discover any agent the existence of which will prove dangerous to the health of the city and there is no ordinance competent to the correction of the evil, the Commissioner shall immediately report the same to the Board of Public Welfare accompanied with the Commissioner's opinion of the necessity of extraordinary or particular action.

The Board of Public Welfare was abolished in 1975, at which time its duties and powers were transferred to the Minneapolis City Council.

clearly has a valid and substantial interest in protecting the health, safety, and welfare of its citizens. The Court finds that Minneapolis has the right, through the exercise of its police power, to take reasonable steps to protect its citizens in dealing with a major health problem. But to fully meet the second criteria, defendant must show the ordinance serves a public health purpose. To establish this, "it is necessary only that the City ... demonstrate that the evidence it relied upon 'is reasonably believed to be relevant to the problem that the city addresses.'" *Broadway Books, Inc. v. Roberts*, 642 F.Supp. 486, 491 (E.D. Tenn.1986) (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. at 49, 106 S.Ct. at 930).

■ The record before the council is set forth in the findings of fact, above. Plaintiffs make no argument that the council adopted the ordinance in the absence of a sufficient empirical basis. *See City of Renton*, 106 S.Ct. at 931; *Thames Enterprises, Inc. v. City of St. Louis*, 851 F.2d 199, 201 (8th Cir.1988). Rather, plaintiffs disagree with the conclusions drawn by the Minneapolis City Council.

There appears to be a rational nexus between the council's findings and the ordinance it passed. *See Broadway Books*, 642 F.Supp. at 491 (citing *CLR Corp. v. Henline*, 702 F.2d 637 (6th Cir.1983)). It is not for this Court, being an adjudicative entity, to second-guess the legitimate legislative fact-finding and decision-making of the Minneapolis City Council. Defendant has established that the ordinance serves a legitimate, governmental objective; the second prong of the *Watseka* test has been met.

The third prong of the *O'Brien* test requires the government interest to be unrelated to suppression of free expression.

> Under this element, courts must "eschew altogether the 'guesswork' of speculating about the motive of lawmakers." [Citation omitted.] Instead, courts must look only to the face of the regulation and the identifiable interest advanced to justify the regulation.

*Wall Distributors*, 782 F.2d at 1170. On its face, and as advanced by the City of Minneapolis, the ordinance is designed to curtail the spread of AIDS by discouraging high risk sexual conduct in commercial establishments which by their design or use facilitate such sexual activity.

Plaintiffs argue that only movie, video, and live dance entertainment are subject to the coverage of the ordinance. From this they would have the Court conclude the sole motive of the council for adopting the ordinance was the suppression of sexually explicit, erotic materials. However, such a conclusion "would involve precisely the type of speculation into legislative motive that [the Court] must avoid in assessing this type constitutional challenge to legislation." *Wall Distributors*, 782 F.2d at 1170. The Court declines to look further than the facially stated purpose and the interests put forth by the city.

■ Plaintiffs also contend the open door booth requirement is an attempt to suppress free expression by making it economically impossible to engage in first amendment activity, citing the experience of Hafiz, above. Such a revenue reduction, they urge, will reduce or eliminate the availability of sexually explicit material. Plaintiff Alexander asserts that an open door will permit one who does not pay to view a film or performance, causing adverse economic impact, thereby reducing his ability to provide such entertainment. He further argues that the open door requirement will discourage customers from patronizing the booths.

The case at bar is not unlike *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). There, the Supreme Court upheld a zoning ordinance which forbade the owner of an adult theater to exhibit adult movies at its current location. The Court acknowledged "the constraints of the ordinance with respect to location may indeed create economic loss for some who are engaged in this business." *Id.*, 427 U.S. at 78, 96 S.Ct. at 2456. The Court went on to state:

> The inquiry for First Amendment purposes is not concerned with economic im-

pact; rather, it looks only to the effect of this ordinance upon freedom of expression. This prompts essentially two inquiries: (i) Does the ordinance impose any content limitation on the creators of adult movies or their ability to make them available to whom they desire, and (ii) does it restrict in any significant way the viewing of these movies by those who desire to see them?

*Id.*

The Minneapolis ordinance addresses only the physical structure of a viewing booth or cubicle. The ordinance does not, in any way, bar or limit the numbers of such booths or other fora for such display. Public access is not substantially impaired. This material is fully available for public consumption.

While a drop in revenue may result, *Young v. American Mini Theatres* makes clear this is not determinative. Just as *Young*'s theater proprietors had to relocate to pursue their enterprise, so plaintiff Alexander may have to alter his mode of merchandise display or presentation. Further, the Court finds the revenue loss to be insignificant when counterbalanced by the health concerns to which the ordinance is directed.

The Court finds the governmental interest in this ordinance does not relate to the suppression of free expression.

*Watseka* next requires defendant to show the ordinance leaves open ample alternative channels of communication. Plaintiffs Doe and Campbell, as patrons of the viewing booths, claim a privacy right permitting them to watch sexually explicit films or live dancing in seclusion. They argue that the loss of commercially available secluded booths will not assure ample alternative channels of communication for these materials. They assert the open booth provision of the ordinance significantly affects their ability and willingness to view these materials. First, plaintiffs claim they will suffer discomfort and embarrassment if others observe them viewing sexually explicit materials. Plaintiffs claim fear of being sexually propositioned or harassed by onlookers if the booths are not closed. Second, they claim an open door would expose their tastes in viewing material to the public which would chill their ability to select from the full panoply of offerings. Third, they claim they would be unwilling to pay for a movie where other persons who have not paid might attempt to watch the movie. Plaintiffs also claim a right to exercise first amendment rights in the absence of compelled disclosure to the government.

 The Court first addresses plaintiffs' claim to a privacy right to watch erotic films in seclusion. Plaintiffs cite no cases supporting such a proposition and the Court has found none. Traditionally, the right of privacy encompasses and protects the personal intimacies of the home, the family, marriage, parenthood, procreation, and child rearing. *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 65, 93 S.Ct. 2628, 2639, 37 L.Ed.2d 446 (1973). In *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), the Supreme Court found a right of privacy in viewing obscene movies in one's own home. The Court in *Paris* distinguished the privacy of one's home from privacy in a commercial establishment:

> It is unavailing to compare a theater, open to the public for a fee, with the private home of *Stanley v. Georgia* [citations omitted]. ... This Court, has, on numerous occasions, refused to hold that commercial ventures such as a motion-picture house are "private" for the purpose of civil rights litigation and civil rights statutes. [Citations omitted.]

413 U.S. at 65, 93 S.Ct. at 2639.

The *Paris* court refused to find a privacy right "implicit in the concept of ordered liberty" to watch obscene movies in places of public accommodation. *Id.,* 413 U.S. at 66, 93 S.Ct. at 2640. The Court:

> Declined to equate the privacy of the home relied on in *Stanley* with a "zone" of "privacy" that follows a distributor or a consumer of obscene materials wherever he goes. [Citations omitted.] The idea of a "privacy" right and a place of

public accommodation are, in this context, mutually exclusive.

*Id.; see also Ellwest,* 681 F.2d at 1248.

The right of privacy has not yet been extended to a place of public accommodation. *See Ellwest,* 681 F.2d at 1248. In light of the Supreme Court's language in *Paris,* and the absence of any caselaw establishing plaintiffs' claimed right, the Court declines the invitation to expand the notion of the right to privacy to include the right to watch sexually explicit non-obscene films in a commercial establishment. The Court finds plaintiffs are not precluded except by their own sensibilities from viewing erotic films or live dancing in viewing booths. This analysis and holding applies with equal force to Doe's and Campbell's claimed unwillingness to view a performance in the company of others who have not paid to do so. In the absence of any law in support of their claim of entitlement to view a performance without other observers, the Court finds no such right. While it may be true such a viewing violates their aesthetic sense, no legal right accrues from such sensibility.

■ The Court rejects plaintiffs' claimed right to first amendment anonymity. Plaintiffs in making this claim rely on the Supreme Court's decision in *Lamont v. Postmaster General of United States,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965). Plaintiffs argue that the Court in *Lamont* invalidated a postal service regulation because it prohibited a postal customer from receiving communist political propaganda without first identifying himself to the postal service as a willing recipient of such material. Plaintiffs overread *Lamont.* The Supreme Court held the regulation unconstitutional "because it requires an official act (viz., returning the reply card) as a limitation on the unfettered exercise of the addressees First Amendment rights." *Lamont,* 381 U.S. at 305, 85 S.Ct. at 1495. The Supreme Court did not discuss the anonymity of the recipient.

Plaintiffs suggest open viewing booths will allow the government to observe their activities and such opportunity to observe compels disclosure. If the government is of a mind to monitor these types of activities, and there was no evidence produced at trial to suggest this, certainly one who enters an adult bookstore may be observed doing so from the street. One may also be observed within the bookstore, entering a viewing booth. The claim of right to view erotic films without government observation is essentially the same as a claim of right to view these films in private. The Court has previously held that no right of privacy attaches to the commercial viewing of sexually explicit materials. Likewise, there is no right to view these materials anonymously. One's private, non-commercial viewing environment may be as anonymous or as public as one's tastes command. Neither caselaw nor the constitution require anything more.

■ With regard to adequate channels of communication, the Court notes the ordinance does not restrict plaintiffs' ability to rent, purchase, or privately display any film or video. It simply requires the commercial display to be in a booth without a door. Plaintiffs urge that such a restriction may act as a bar to one without the wherewithal to rent or purchase such entertainment privately. Setting aside the question of whether Doe and Campbell are properly situated to assert such a claim, the fact that some have the means to secure that which others cannot afford may be true, but does not itself offend the constitution. *See, e.g., Kadrmas v. Dickinson Public Schools,* —— U.S. ——, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988).

This Court finds that, in the context of this action, plaintiffs do not have a first amendment right to the commercial anonymous view of sexually explicit videos. The channels of communication for both receipt and dissemination of sexually explicit films and live dancing are ample and adequate.

*Watseka's* fourth prong requires defendant to show the ordinance is narrowly tailored to serve the governmental objective. Plaintiffs argue that, granting the ordinance's goal of AIDS prevention, this goal could be met by less restrictive means than total removal of viewing booth doors. Plaintiffs suggest the removal of the bot-

tom 24 inches of the door, in concert with enforcement of the one-person-one-booth and aperture-repair mandates of the *Henningsgard* injunction, will accomplish the city's goals. Their position is without support in the record. *See* Testimony of Michael Rayer, *supra*, p. 779.

It is clear that the one person per booth and aperture repair requirements were already in force when the council enacted the ordinance. *Henningsgard*, No. 761468, slip op. at 2. It is obvious the council felt that further regulation was required to achieve its public health objective of decreasing the spread of AIDS.

> Other courts have considered this issue: The open booth regulation appears to be the least burdensome means of controlling offensive and illegal activity within booths that can be imagined. The regulation in no way limits the time of operation, number of booths, or content of exhibitions. We conclude that the regulation is both narrowly tailored to serve the specific interest advanced by the City and that it leaves open ample channels of communication, and therefore, meets this test. [Citations omitted.]

*Wall Distributors*, 782 F.2d at 1170; *see Berg v. Health & Hosp. Corp. of Marion County, Ind.*, 667 F.Supp. 639, 644 (S.D. Ind.1987); *see, e.g., Broadway Books*, 642 F.Supp. at 492. The Court finds no constitutional defect in the method chosen by Minneapolis to further its substantial interests. *See Renton*, 106 S.Ct. at 931. The city has met its burden with regard to the narrowly tailored requirement.

◼ Based on the foregoing, the Court finds that defendant has fully satisfied the *Watseka* test for a time, place, and manner restriction. The Court holds that Minneapolis Ordinance, §§ 219.500–219.530, does not impermissibly infringe upon plaintiffs' first amendment rights.

Plaintiffs recast their "narrowly tailored" argument in their claim that the ordinance is overbroad. A law is overbroad if "it does not aim specifically at

evils within the allowable area of control but sweeps within its ambit activities that constitute an exercise of first amendment rights." *Broadway Books*, 642 F.Supp. at 490 (citing *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940)).

> Where conduct and not merely speech is involved, ... the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.

*Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830, 842 (1973); *see Berg*, 667 F.Supp. at 642. The Court, as previously discussed, has determined the ordinance is precisely aimed at matters which are within the city's power to regulate. The chosen means to accomplish these goals are narrowly tailored to achieve its objectives. The Court does not find the ordinance invalid for overbreadth.

◼ Plaintiff Alexander next maintains the ordinance deprives him of equal protection of the law in violation of the fourteenth amendment because it applies only to adult bookstores. He claims the ordinance permits unregulated gay bathhouses,[16] massage parlors, saunas, hotels, and motels. He asserts these are comparable establishments where high risk sexual activities are likely to occur.

Plaintiff's argument must fail. With regard to bathhouses, massage parlors, and saunas, there are provisions in the ordinance which arguably cover these establishments. (Section 219.510 defines "booths, stalls, or partitioned portions of a room or individual rooms," as including "enclosures specifically offered to persons for a fee or as incident to performing high risk sexual conduct.") Though the issue is not before this Court, it appears that if these establishments are the sites of unsafe sexual practices, they may well fall within the purview of the ordinance. *See* § 219.510(3)(a).

---

**16.** The Court notes that according to officer Severson's testimony there are no bathhouses in Minneapolis.

Section 219.520(3) specifically excludes structures "lawfully operating as hotels, motels, apartment complexes, condominiums, or rooming houses." The Court cannot gainsay the possibility that unsafe sex may occur in these sites or dozens of others which can be imagined. The exemption of certain structures, however, does not support an argument for deprivation of equal protection. AIDS presents a complex and difficult public health problem. In such an area "the city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Renton,* 106 S.Ct. at 931 (quoting *American Mini Theatres,* 427 U.S. at 71, 96 S.Ct. at 2453).

The Court finds the ordinance does not invidiously single out adult bookstores or encumber first amendment activities. Its objective is to regulate commercial establishments where there is clear evidence that high-risk sexual conduct occurs. Plaintiff Alexander has not been deprived equal protection of the law in violation of the fourteenth amendment.

Based on the foregoing, IT IS ORDERED that:

1. Plaintiffs' prayer for a declaratory judgment finding Minneapolis Code of Ordinances, §§ 219.500–219.530, to be unconstitutional is denied.

2. The temporary restraining order, originally filed June 10, 1988, in the above-entitled matter and subsequently amended on July 5, 1988, is hereby dissolved.

3. Plaintiffs' motion for a preliminary and permanent injunction is denied.

LET JUDGMENT IN FAVOR OF DEFENDANT BE ENTERED ACCORDINGLY.