Dennis O'CONNOR and United Theaters Incorporated, d/b/a Empress Theater, 111 South Broadway, Inc., d/b/a After Dark and Matties Theatre, Plaintiffs–Appellants,

v.

The CITY AND COUNTY OF DENVER, an incorporated municipality; L. Bellio; Dean Jones; Dale Wallis; Steve Rosengren; Mark Leone; and Terry Ball, Defendants–Appellees.

No. 87–2434.

United States Court of Appeals, Tenth Circuit.

Jan. 29, 1990.

Rehearing Denied March 12, 1990.

**1212**

Michael W. Gross of Arthur M. Schwartz, P.C., Denver, Colo., for plaintiffs-appellants.

Stan M. Sharoff, Asst. City Atty. (Stephen H. Kaplan, City Atty., with him on the brief), Denver, Colo., for defendants-appellees.

Before BALDOCK and BRORBY, Circuit Judges, and WRIGHT, Senior Circuit Judge.[*]

BRORBY, Circuit Judge.

Pursuant to 42 U.S.C. §§ 1983 and 1988 (1982) Dennis O'Connor (O'Connor); United Theaters Incorporated, d/b/a Empress Theater (the Empress); and 111 South Broadway, Inc., d/b/a After Dark and Matties Theatre (the After Dark) (the Empress and the After Dark are referred to jointly as the Theatres) sought declaratory and injunctive relief against the enforcement of Denver Municipal Code §§ 7–11 through 7–40 (the Code) pertaining to licensing of "entertainments". The plaintiffs claimed that the Code stood in violation of their rights under the First and Fourteenth Amendments to the United States Constitution. In addition, the Theatres sought damages for the closure of their businesses under the Code. O'Connor sought damages resulting from his arrest and detention for operating without a license in violation of the Code. After a trial to the court,[1] the court ordered entry of judgment for the defendants, the City and County of Denver and various law enforcement officers in their official capacities, and against the plaintiffs. The trial court concluded that the plaintiffs were not entitled to nominal damages or attorney fees. O'Connor and the Theatres appeal the judgment entered on the trial court's opinion. We AFFIRM.

## I. FACTS

111 South Broadway, Inc. is a Colorado corporation that owns and operates the After Dark and Matties Theatres in Denver, Colorado. United Theatres, Inc. is a Colorado corporation that owns and operates the Empress Theater, also in Denver. Both the Empress and the After Dark exhibit sexually explicit motion picture films. Each of the theatres held amusement licenses from the Department of Excise and Licenses of the City and County of Denver (the Department). At the time of the incidents giving rise to the action below, O'Connor was a cashier at the Empress.

Pursuant to an order to show cause issued by the Director of Excise and Licenses (the Director), Martin J. Baker, holder of the license for the Empress, was summoned to appear before the Department for a hearing to suspend or revoke its

---

[*] The Honorable Eugene A. Wright, Senior Judge, United States Court of Appeals, Ninth Circuit, sitting by designation.

1. O'Connor and the Theatres did not call any witnesses at trial, but rested their case upon the stipulation and exhibits of the parties. Without explanation, O'Connor failed to appear for trial. O'Connor and the Theatres did cross-examine the City's two witnesses.

amusement license. The order to show cause why the Department should not suspend the license stemmed from allegations that patrons of the theater were engaging in public sex acts in violation of Denver's public indecency ordinances. After a hearing on July 25, 1984, the Department's hearing officer found that Martin Baker provided dimly lit areas where indecent acts took place and provided no supervision of these areas.[2] The hearing examiner recommended suspension or revocation of the Empress' license based on the owner's failure to prevent indecent acts from being committed in his establishment. The Director subsequently adopted the hearing officer's findings and set a penalty hearing, which was not held until April 15, 1985. At the penalty hearing, the City Attorney presented 126 Denver Police Department Vice and Drug Control Bureau case summary sheets documenting the same number of citations for acts of public indecency committed by Empress patrons between January 5, 1983, and February 15, 1985. On May 20, 1985, pursuant to § 7–39 of the Code, the Director issued a written order revoking the Empress' amusement license.

Contending the entire licensing scheme was unconstitutional, the Empress elected to remain open. When O'Connor reported to work on July 23, 1985, he was arrested and jailed for operating without an amusement license in violation of § 7–26 of the Code. On August 2, 1985, the Empress and O'Connor commenced an action in the District Court in and for the City and County of Denver, Colorado, seeking injunctive and declaratory relief and damages. On August 21, 1985, the Empress and O'Connor filed a Petition for Removal to the United States District Court for the District of Colorado.

Meanwhile, on July 10, 1985, the Director summarily suspended the amusement license of the After Dark, which was held by 111 S. Broadway, Inc. The order was entered as a result of a complaint filed with the Director by the city attorney's office, which included sixty-five case summary sheets representing a like number of criminal citations for public indecency issued to patrons of the After Dark. The citations were issued for a wide variety of public sex acts including masturbation, fellatio and sexual intercourse. A hearing was held July 23–24, at which four Denver police officers testified as to various acts they had witnessed. One officer also testified about a group of five booths in a row with so-called "glory holes" cut in the shared walls at waist level. The booths were completely dark and were the site of sexual acts between unknown partners. The trial court found and the parties do not challenge the fact that it was impossible to view films shown in the theater from inside the booths.

Based upon the evidence presented at the hearing, the Director revoked the After Dark's license. The After Dark immediately filed the complaint in the instant action seeking declaratory and injunctive relief against the enforcement of Denver's allegedly unconstitutional licensing scheme. The district court consolidated the After Dark's action with that of the Empress and O'Connor. While state and federal actions were pending, the Director granted the issuance of the After Dark's new amusement license.[3] Furthermore, during the pendency of the federal lawsuit, the City repealed §§ 7–26, 7–39 and 7–40, and replaced these sections with revised § 7–26.

## II. STANDING AND MOOTNESS

The district court concluded that O'Connor and the Theatres had standing to assert the unconstitutionality of the repealed Denver Municipal Code sections, but lacked standing to assert the unconstitutionality of the revised version of the Code due to the fact they had abandoned their claim.

---

**2.** In a conversation with an investigating officer, Mr. Baker admitted that he knew sex acts were occurring frequently at the Empress but stated that he was "provid[ing] a public service so that these individuals didn't go into K–Mart and King Soopers and perform these acts."

**3.** Various state court proceedings were conducted as a result of the administrative action and the issuance of citations to employees of the theatre. We need not discuss those proceedings in order to resolve the issues in this appeal.

O'Connor, the Empress and the After Dark argue the court erred in so ruling. They assert they have standing to challenge the constitutionality of the revised ordinance because it remains substantially similar to the one which the City repealed. Appellants' Brief at 12–15. We do not agree. We hold that because O'Connor and the Theatres abandoned their claim at trial, they lack standing to assert the unconstitutionality of the revised version of the Code.

" 'Standing doctrine is designed to determine who may institute the asserted claim for relief.' " *ACORN v. City of Tulsa, Okla.*, 835 F.2d 735, 738 (10th Cir.1987) (emphasis omitted) (quoting *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 940 (D.C.Cir.1986)). In order to avoid futile proceedings, we determine whether the matter involves injury (actual or threatened) and whether judicial action is likely to redress the injury.

> The constitutional dimension of standing derives from article III, which limits the judicial power of the United States to "cases" and "controversies." In order to satisfy the article III restrictions on standing, a party must show at least that he or she has suffered an actual or threatened injury caused by the defendant and that a favorable judicial decision is likely to redress the injury.

*Id.* at 738 (citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982)). Absent this showing, a court need not entertain the parties' contentions.

■ Within the First Amendment context, courts properly apply an expanded notion of standing to determine who may institute the asserted claim for relief. "[W]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988). Parties "who have not actually engaged in protected activity are allowed to challenge a statute that inhibits others from engaging in protected speech or expression." *ACORN v. City of Tulsa*, 835 F.2d at 738 (citing *Secretary of State v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57, 104 S.Ct. 2839, 2846–47, 81 L.Ed.2d 786 (1984)); *see Association of Community Orgs. for Reform Now, ("ACORN") v. Municipality of Golden, Colo.*, 744 F.2d 739, 745 n. 3 (10th Cir.1984). Under these principles, O'Connor and the Theatres argue they have standing to challenge the constitutionality of the revised portions of the Code.

■ This expanded notion of standing, however, has no application in the instant case. Standing to raise an issue does not preserve for appeal a claim abandoned at trial. Stated differently, the standing doctrine does not undo the parties' trial strategy or their decisions regarding how to fashion their case. We do not consider on appeal issues not raised in the district court. *Gillihan v. Shillinger*, 872 F.2d 935, 938 (10th Cir.1989). Similarly, we will not consider claims abandoned in the district court.

■ At trial, O'Connor and the Theatres limited their case to the constitutionality of the repealed Code. Although the trial court's Supplemental Pre–Trial Order, indicates that O'Connor and the Theatres challenged the constitutionality of the Code in both its former and amended versions, at trial plaintiffs abandoned their claim as to the amended version and proceeded with only their claim that the former version of the Code was unconstitutional. In addressing the trial court, counsel for plaintiffs stated:

> And they eventually did [amend the amusement licensing ordinance]. Whether they corrected the problem remains to be seen. We contend that they didn't. But that issue will probably be resolved another day.

> But, again, to capsulize, 7–39 overly broad discretion and no procedural safeguards. And 7–26 equal protection, vagueness and overly broad discretion.

It would seem again based upon all of the cases cited by the Plaintiffs there is no doubt that this ordinance is unconstitutional, and it's not even a borderline case.

The trial court concluded the unconstitutionality of the revised Denver Municipal Code sections was not at issue and addressed the plaintiffs' claims only as to the constitutionality of the Code prior to the amendments.

We agree with the trial court that O'Connor and the Theatres abandoned their claim as to the revised Code and did not seek a determination from the trial court that the revised Code was unconstitutional. Consequently, the only issue of standing before us is whether O'Connor and the Theatres have standing to challenge the Code as it read before the effective date of the revisions. Because O'Connor and the Theatres suffered injury when the Director revoked their licenses and they received citations for operating without them, we hold they have standing to challenge the validity of the Code as it read at the time of the official actions that gave rise to their complaint.

■ The City argues that amending the Code mooted[4] all of O'Connor's and the Theatres' claims for relief. O'Connor and the Theatres admitted in their pleadings that their claims for injunctive and declaratory relief were moot for the reason that the City amended and repealed the pertinent sections of the Code. At trial, plaintiffs withdrew their claims for damages except nominal damages. Consequently, we need consider only whether the lonely claim for nominal damages is moot.

Citing *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986), the City argues that plaintiffs' withdrawal of all claims for damages combined with the failure of plaintiffs to prove injury at trial mooted all claims for monetary relief, even nominal damages. Appellees' Brief at 15–

16. In *Stachura*, the plaintiff filed a § 1983 action seeking both compensatory and punitive damages. The district court instructed the jury on the standard elements of compensatory and punitive damages and also charged the jury that additional compensatory damages could be awarded based on the value or importance of the constitutional rights that were violated. The Sixth Circuit affirmed, but the Supreme Court reversed, holding "damages based on the abstract 'value' or 'importance' of constitutional rights are not a permissible element of compensatory damages in such cases." 477 U.S. at 310, 106 S.Ct. at 2545. The Court in *Stachura* clearly distinguished nominal damages from the damages at issue. The Court wrote:

[N]ominal damages, and not damages based on some undefinable "value" of infringed rights, are the appropriate means of "vindicating" rights whose deprivation has not caused actual, provable injury: "... By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights."

*Id.*, 477 U.S. at 308–09 n. 11, 106 S.Ct. at 2543–44 n. 11 (quoting *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978)). Thus, *Stachura* indicates that nominal damages are recoverable without proof of actual injury, and therefore does not support the City's argument.

Plaintiffs' withdrawal of claims coupled with the failure of their proof did not moot their claim for nominal damages. In *Taxpayers for Animas–La Plata Referendum*

---

**4.** In this appeal, both parties play fast and loose with the issue of mootness. The court perceives mootness here as one battleground over attorney fees under 42 U.S.C. § 1983. Resolution of

the fee dispute, however, depends upon our review of the trial court's determination that plaintiffs were not "prevailing parties."

v. Animas–La Plata Water Conservancy Dist., 739 F.2d 1472, 1479 (10th Cir.1984), we stated: "Indeed, by definition claims for past damages cannot be deemed moot." There is no question that the nominal damages sought in this case were past damages not affected by any changes in the Code. We hold that repeal and amendment of the Code did not moot plaintiffs' claim for nominal damages.

## III. FIRST AMENDMENT

O'Connor and the Theatres argue that because their activities of providing entertainment are protected by the First Amendment to the United States Constitution, all issues in this appeal are First Amendment issues. They challenge the facial validity of the Code, asserting the licensing requirement itself imposes a prior restraint on First Amendment activity and the challenged ordinance provides unconstitutionally broad discretion to licensing officials and law enforcement officials. They further argue the Code is unconstitutionally vague in light of heightened First Amendment inquiry.

The trial court found no constitutional infirmity in the Code. Relying on Arcara v. Cloud Books, Inc., 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), the trial court determined this case deals with an action by the City in response to public nuisances occurring on the Theatres' premises and therefore does not implicate or trigger First Amendment protections. We agree with the trial court. Further, because O'Connor and the Theatres have not demonstrated any infringement of their First Amendment rights by the licensing scheme, the City does not bear the burden of showing the constitutionality of the licensing scheme. See Association of Community Orgs. for Reform Now,

("ACORN") v. Municipality of Golden, Colo., 744 F.2d 739, 746 (10th Cir.1984).

### A. Arcara applied

■ Citing Schad v. Borough of Mount Ephraim, 452 U.S. 61, 65, 101 S.Ct. 2176, 2180, 68 L.Ed.2d 671 (1981), O'Connor and the Theatres state: "[S]ince the Denver amusement licensing scheme regulates 'entertainment,' there can be no dispute the ordinance must fulfill the strict requirements for regulation of First Amendment expression." Appellants' Brief at 16. Schad, however, does not apply to the instant case. In Schad, the challenged code provision prohibited "all uses not expressly permitted," which included all live entertainment and nude dancing, a protected form of First Amendment expression. In declaring the law overbroad, the Court held the Borough failed to justify the exclusion of live entertainment from the broad range of commercial uses permitted in the Borough. See Schad, 452 U.S. at 65–66, 72–77, 101 S.Ct. at 2180–81, 2184–87. We perceive a meaningful difference between prohibiting all live entertainment in Schad and closing business establishments because of the repeated and sanctioned criminal conduct in the instant case.[5] Unlike Schad, the ordinance now before the court was not designed or used to prohibit entertainment or regulate the content thereof.[6] Although under the City's scheme one must obtain an amusement license before presenting "entertainment" (as defined by the ordinance) to the public, the Code arguably applies to all entertainment businesses. O'Connor and the Theatres base their entire argument on a faulty premise that the Code infringes their First Amendment rights.

In our view, the trial court correctly applied Arcara v. Cloud Books, Inc., 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), and determined that First Amendment pro-

---

5. According to the hearing officer in In re Martin J. Baker, d/b/a Empress Theatre, Nos. 85–F–1967 and 85–F–1968, Martin Baker testified that he knew gay sexual aids were sold on the premises and he had never had any employee stationed in the back of the theatre even though he was aware of arrests made on the premises and at one time had sealed off the private booths.

6. In affidavits supporting their motion for summary judgment, the sole shareholder of the After Dark and the attorney representing the Empress individually conceded the issuance of an amusement license was contingent solely upon payment of the application fee and passing inspection by the Zoning, Building and Fire Departments.

tections are not at issue. In *Arcara*, a criminal investigation revealed that an "adult" bookstore was also the site of solicitation of prostitution, public acts of masturbation, fondling, and fellatio, all within the observation of the proprietor. The district attorney filed a civil complaint seeking closure of the premises under a statute which authorized closure of a building found to be a public health nuisance because it was being used as a place for prostitution and lewdness. The bookstore claimed First Amendment protections. In the Court's view, the statute was directed at unlawful conduct having nothing to do with books or other expressive activity. "[W]e conclude the First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books." *Id.* at 707, 106 S.Ct. at 3177. In *Arcara*, the Supreme Court declined to apply the First Amendment least restrictive means test to the statute under which the bookstore was closed.

Similarly, the Theatres were closed under an ordinance that was directed at unlawful conduct having nothing to do with movies or other expressive conduct. At trial, the Director testified that he revoked the licenses of the Theatres because of a significant number of acts of public indecency. Further, the investigating officer testified that the film fare at the Theatres was unrelated to his investigation of reported criminal activity on the premises. The trial court wrote:

> [T]his case involves first amendment considerations only incidentally, if at all.
>
> [Note 4] The issue is whether plaintiffs may avoid the requirements of complying with public safety standards merely because they show films which are protected by the first amendment. The fact that a commercial enterprise deals in material protected by the first amendment does not immunize it from police power regulations. *Chulchian v. City of Indianapolis*, 633 F.2d 27, 31 (7th Cir. 1980).

In our view, this case evidences legitimate police power regulation very similar to the regulation in *Arcara*. In *Arcara* the Court wrote:

> It is true that the closure order in this case would require respondents to move their bookselling business to another location. Yet we have not traditionally subjected every criminal and civil sanction imposed through legal process to "least restrictive means" scrutiny simply because each particular remedy will have some effect on the First Amendment activities of those subject to sanction. Rather, we have subjected such restrictions to scrutiny only where it was conduct with a significant expressive element that drew the legal remedy in the first place, as in *[United States v.] O'Brien*, [391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)] or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity, as in *Minneapolis Star [ & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983)]. This case involves neither situation, and we conclude the First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books.

*Arcara*, 478 U.S. at 706–07, 106 S.Ct. at 3177. Under the reasoning of *Arcara*, the enforcement of the criminal code and the closure of the Theatres in this case do not implicate First Amendment protections.

We reach our conclusion with an appreciation of the fact that determining whether First Amendment protections are at issue is not a mechanical task. In *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 772, 108 S.Ct. 2138, 2152, 100 L.Ed.2d 771 (1988), the Court held, in part, that a statute giving the mayor unbridled discretion whether to permit newsracks was unconstitutional. In so holding, the Court reiterated the focus of the First Amendment inquiry:

> The danger giving rise to the First Amendment inquiry is that the government is silencing or restraining a channel of speech; we ask whether some interest

unrelated to speech justifies this silence. To put it another way, the question is whether "the manner of expression is basically incompatible with the normal activity of a particular place at a particular time."

108 S.Ct. at 2147 (quoting *Grayned v. Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972)). We are not persuaded that the government was silencing or restraining a channel of speech. The act of closing the premises does not present the same constitutional issue as the act of prohibiting movies. The Theatres were entitled to open elsewhere upon showing that they met with Zoning, Building and Fire Department regulations and they paid the license fee. Although O'Connor and the Theatres argue that the City used the Code to suppress protected activity, the evidence convinces us to the contrary.[7] The argument that failed in *Arcara* fails here as well.

Further, under the *Lakewood* analysis, the instant case does not even raise an issue regarding suppression of constitutionally protected expression. In *Lakewood* the Court wrote: "In determining whether expressive conduct is at issue in a censorship case, we do not look solely to the time, place, or manner of expression, but rather to whether the activity in question is commonly associated with expression." 108 S.Ct. at 2150. "The actual 'activity' at issue here is the circulation of newspapers, which is constitutionally protected.... So here, the First Amendment is certainly implicated by the City's circulation restriction; the question we must resolve is whether the First Amendment is abridged." *Id.* at 2149–50.

While the placing of newsracks may be "commonly associated with expression," participation in public sex acts is not commonly associated with any constitutionally protected expression. *Cf. Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (no fundamental consti-

tutional right to engage privately in consensual acts of sodomy between homosexuals). *Lakewood* does not cloak the paper boy with First Amendment protection should he choose to engage in public sex acts while delivering the newspaper. The case presented by O'Connor and the Theatres does not raise a First Amendment issue.

Furthermore, we are not persuaded that the Code affects First Amendment protections even incidentally. The notion of "incidental burden" on protected expression was addressed in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), where speech and nonspeech elements were combined in the same course of conduct, the burning of a draft card. *Id.* at 376, 88 S.Ct. at 1678. The statute at issue imposed criminal sanctions for alteration of a draft card. In upholding the constitutionality of the statute, the Court held, in part, that when speech and nonspeech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify *incidental* limitations of First Amendment freedoms. Hence, questions of "incidental burden" arise only after a court has determined the case presents a First Amendment issue.

The notion of "incidental burden" should not be used to elevate non-First Amendment conduct to the level of First Amendment expression solely because it occurs at the location of or simultaneous with protected expression. *See Arcara,* 478 U.S. at 703, 106 S.Ct. at 3175. In *Arcara,* the Court drew an important distinction between the *O'Brien* analysis and the analysis properly made in a case such as ours. The Court wrote:

The New York Court of Appeals held that the *O'Brien* test for permissible governmental regulation was applicable to this case because the closure order

---

7. The parties agree the content of the films shown at the Theatres was sexually explicit and protected by the First Amendment. Stipulation in Pre–Trial Order. The uncontroverted evidence at trial was that the content of the films

had no bearing on the decision to revoke the licenses. Testimony of Manual Martinez, Director of Excise and Licenses. Neither O'Connor nor the Theatres claimed that the stated reasons for closing were pretextual.

sought by petitioner would also impose an incidental burden upon respondents' bookselling activities. That court ignored a crucial distinction between the circumstances presented in *O'Brien* and the circumstances of this case: unlike the symbolic draft card burning in *O'Brien*, the sexual activity carried on in this case manifests absolutely no element of protected expression. In *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 67 [93 S.Ct. 2628, 2640, 37 L.Ed.2d 446] (1973), we underscored the fallacy of seeking to use the First Amendment as a cloak for obviously unlawful public sexual conduct by the diaphanous device of attributing protected expressive attributes to that conduct. First Amendment values may not be invoked by merely linking the words "sex" and "books."

*Arcara*, 478 U.S. at 704–05, 106 S.Ct. at 3176. Thus, the Court made clear that the "incidental burden" analysis does not apply to the closure of a business engaged in protected activity as a result of criminal conduct occurring on the premises. In the same way that closure of the bookstore in *Arcara* was not an "incidental burden" on First Amendment activities, closure of the Theatres due to public sex acts on the premises does not place an "incidental burden" on activities protected by the First Amendment.

Similarly, the disproportionate burden inquiry referred to in *Arcara* does not operate to apply First Amendment scrutiny herein. In *Arcara* the Court acknowledged it has "also applied First Amendment scrutiny to some statutes which, although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities." *Arcara*, 478 U.S. at 703–04, 106 S.Ct. at 3176. The

Court also noted that in *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), the Court

> struck down a tax imposed on the sale of large quantities of newsprint and ink because the tax had the effect of singling out newspapers to shoulder its burden. We imposed a greater burden of justification on the State even though the tax was imposed upon a nonexpressive activity, since the burden of the tax inevitably fell disproportionately—in fact, almost exclusively—upon the shoulders of newspapers exercising the constitutionally protected freedom of the press.

*Arcara*, 478 U.S. at 704, 106 S.Ct. at 3177. While acknowledging this precedent, the Court did not apply the "disproportionate burden" analysis to the facts in *Arcara*. Similarly, we see no application of the analysis herein.

Further, we see a distinction between the so-called "open booth" cases and the instant case. In the "open booth" cases, courts have considered the constitutionality of ordinances designed to curtail anonymous sexual activities in commercial establishments. In *Berg v. Health & Hosp. Corp.*, 865 F.2d 797 (7th Cir.1989), and other "open booth" cases, the private booths were places where films were viewed. *See Wall Distribs., Inc. v. City of Newport News*, 782 F.2d 1165 (4th Cir.1986); *Ellwest Stereo Theatres, Inc. v. Wenner*, 681 F.2d 1243 (9th Cir.1982); *Doe v. City of Minneapolis*, 693 F.Supp. 774 (D.Minn.1988); *Broadway Books, Inc. v. Roberts*, 642 F.Supp. 486 (E.D.Tenn.1986). In *Berg*, the Seventh Circuit upheld the ordinance as a valid time, place and manner restriction on film dissemination protected by the First Amendment.[8] 865 F.2d at 805. In the

---

8. Other courts have resolved challenges to regulation of closed booths on theatre premises in the same way. In *FW/PBS, Inc. v. City of Dallas*, 837 F.2d 1298, 1304 (5th Cir.1988), *aff'd in part & vacated in part on other grounds*, — U.S. ——, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), the Fifth Circuit upheld an "open booth" ordinance as a reasonable time, place and manner restriction under the analysis set forth in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), a zoning case.

In *Wall Distribs., Inc.*, 782 F.2d at 1168, the Fourth Circuit relied on the tests set forth in *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984), and *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968), and determined that the regulation must be analyzed under a manner restriction test, "for the regulation does not regulate speech on the basis of content, but instead,

instant case, however, the films presented at the After Dark could not be seen from the booths erected in the theatre. Furthermore, in the instant case, the licensing scheme in question was created simply to generate revenue and insure public health and safety, whereas the ordinances in the open booth cases focused on preventing sexual contact. The fact that the theatre just happened to have booths does not change the issues before us regarding the licensing scheme or the revocation thereof.

We believe the trial court in this case properly applied *Arcara* and removed the case from the First Amendment focus. The issues before us are whether and to what extent the City may regulate illegal conduct on the Theatres premises, and *Arcara* addresses those questions. Contrary to O'Connor's and the Theatres' contentions, the application of *Arcara* does not depend on the character of the governmental action, i.e., nuisance versus revocation. Rather, *Arcara* applies to any regulation of nonprotected conduct on the premises of a business engaged in protected expression. The fact that a business engages in protected expression does not cloak all activities on the premises, from the sale of concessions to the commission of crime, with First Amendment protection. Under the facts of this case, we hold the First Amendment is not implicated by the closure of the Theatres.

## B. Prior Restraint

■ O'Connor and the Theatres contend that § 7–26 of the Code,[9] which requires a party to obtain a license prior to exhibiting films is "the very essence of a prior restraint of free expression." Appellants'

Brief at 18.[10] They argue that because no license is required "when such entertainment is ... for patriotic, philanthropic, social service, health, welfare, benevolent, educational, fraternal or religious purposes, or by a nonprofit organization," the determination of whether an amusement license is required under § 7–26 "rests completely in the discretion of licensing officials." Appellants' Brief at 18. We do not agree with O'Connor and the Theatres.

■ First, the requirement of an amusement license under the Code does not constitute a prior restraint. Prior restraint arises where the content of the expression is subject to censorship. *See Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713, 51 S.Ct. 625, 630, 75 L.Ed. 1357 (1931). " 'Governmental action constitutes a prior restraint when it is directed to suppressing speech because of its content before the speech is communicated.' " *Berg*, 865 F.2d at 801 (quoting *United States v. Kaun*, 827 F.2d 1144, 1150 (7th Cir.1987), and *In re G. & A. Books, Inc.*, 770 F.2d 288, 296 (2d Cir.1985), *cert. denied sub nom. M.J.M. Exhibitors, Inc. v. Stern*, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986)). The Supreme Court has struck down regulations as unconstitutional prior restraints on speech where they gave "public officials the power to deny use of a forum in advance of actual expression." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975). In the instant case, the Code did not ban the presentation of any forms of entertainment or grant officials the discretion to suppress any speech based upon its content. The license requirement applied to all forms of entertainment when

---

restricts primarily noncommunicative aspects of [plaintiff's] right to disseminate the content of the films and thereby imposes only an incidental burden on that right." 782 F.2d at 1168 (footnote omitted).

9. Section 7–26 reads:
It shall be unlawful for any person, in any capacity whatsoever, to give, conduct, produce, present, or offer any entertainment mentioned in section 7–12, without first having applied for and obtained a license so to do; provided, however, that no license shall be required when such entertainment is to be

given, conducted, produced, presented, or offered in facilities rented or leased from the city for that purpose, or when such entertainment is given, conducted, produced, presented or offered for patriotic, philanthropic, social service, health, welfare, benevolent, educational, fraternal or religious purposes, or by a nonprofit organization.

10. Under the City's ordinances, businesses providing nearly every conceivable form of entertainment must obtain licenses prior to opening their doors.

offered "for gain." Furthermore, the health and safety requirements applied to all entertainment as defined in the Code. "The mere fact that the commercial exploitation of material protected by the First Amendment is subject to zoning *and other licensing requirements* is not a sufficient reason for invalidating these ordinances." *Young v. American Mini Theatres*, 427 U.S. 50, 62, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (1976) (emphasis added). In our view prior restraint is not an issue in this case.

Second, the fact that the Code exempted from the licensing requirement entertainment offered or presented under circumstances described unambiguously in § 7–26 does not vest the Director with "unbridled discretion," which could result in censorship. Under the Code, a license was granted to an applicant on a showing that he complied with basic health and safety regulations. The discretion of the licensing official was discretion to determine who paid for a license and who did not pay for a license. The Director had no discretion to deny a license if the required inspections and approvals were obtained. Appellees' Brief at 11 (citing § 32–11 of the Code).

In our view, a facial challenge to the Code in this case is unsupportable. In *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 759, 108 S.Ct. 2138, 2145, 100 L.Ed.2d 771 (1988), the Court wrote: "[A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." The Court further observed: "[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a governmental official or agency constitutes a prior restraint and may result in censorship." *Id.* at 2143. The instant case, however, presents a completely different licensing scheme than did *Lakewood*, where the ordinance gave the mayor authority to grant or deny applications for annual permits to place newsracks on public property. The licensing scheme at issue here does not place "unbridled" discretion in the hands of the Director. To

the contrary, the record is clear that the license must be issued once compliance with the public health and safety codes is demonstrated. *See* Appellees' Brief at 11.

Further, the provision in the Code providing for revocation or suspension of a license does not create a prior restraint. In *Arcara*, the Court distinguished prior restraint from the closure order in the case before the Court:

> The closure order sought in this case differs from a prior restraint in two significant respects. First, the order would impose no restraint at all on the dissemination of particular materials, since respondents are free to carry on their bookselling business at another location, even if such locations are difficult to find. Second, the closure order sought would not be imposed on the basis of an advance determination that the distribution of particular materials is prohibited —indeed, the imposition of the closure order has nothing to do with any expressive conduct at all.

478 U.S. at 705–06 n. 2, 106 S.Ct. at 3177 n. 2. Similarly, the closure order in the instant case did not prevent the dissemination of particular materials because the Theatres immediately obtained licenses, and the order was not based upon any determination concerning the content of the films. Under the *Arcara* standard, the provision for license revocation does not convert the scheme into a prior restraint.

## C. Vagueness

O'Connor and the Theatres argue that the exemptions contained in § 7–26 render the Code unconstitutionally vague. Appellants' Brief at 32. Citing *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 217–18, 95 S.Ct. 2268, 2276–77, 45 L.Ed.2d 125 (1975), they argue: "It is fundamental that, '[w]here First Amendment freedoms are at stake, we have repeatedly emphasized that precision of drafting and clarity of purpose are' priority considerations." Appellants' Brief at 30. They then argue that because we observed in a footnote that the ordinance in *ACORN* was unconstitutionally vague, *Association of Community Orgs.*

*for Reform Now, ("ACORN") v. Municipality of Golden, Colo.*, 744 F.2d 739, 748 n. 5 (10th Cir.1984), the same words in § 7–26 render the ordinance vague as well. We are not persuaded by this argument. As previously noted, the instant case is not a First Amendment case. Consequently, we do not scrutinize the challenged ordinance from the perspective urged by O'Connor and the Theatres. Rather, we review the ordinance to determine whether it "is so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Under this standard, the challenged language is not unconstitutionally vague.

O'Connor and the Theatres argue that *ACORN* is dispositive. We disagree. In *ACORN*, we held that an ordinance which prohibited door-to-door canvassing unless an exemption was obtained from the city council violated the First and Fourteenth Amendments "[by] empower[ing] the city council to grant exemptions in its discretion so as to control the exercise of First Amendment rights. Moreover the ordinances [could not] be justified as time, place, and manner regulations because they are not content neutral." 744 F.2d at 750. ACORN's goal was to assist persons of low and moderate income to organize their neighborhoods so that they might petition authorities on issues of concern to them. ACORN's staff went door-to-door informing residents of the program and seeking donations. The ordinance at issue prohibited solicitation *unless* the city manager issued an exemption. *Id.* at 741. Exemptions could be obtained if the solicitation were for "charitable, religious, patriotic or philanthropic purpose or otherwise provide[d] a service or product so necessary for the general welfare of the residents of the city that such activity does not constitute a nuisance." *Id.*

O'Connor and the Theatres argue that since a similar exemption appeared in the Code, although it did not apply to them, the Code was unconstitutionally vague and gave "licensing officials, police officers,

judges and juries ... unbridled discretion to determine which individuals are permitted to exercise First Amendment rights." Appellants' Brief at 23. *ACORN*, however, does not apply. In *ACORN*, speech itself was prohibited unless it fell within the exempted categories. Such is not true in the instant case. The Code provided for the grant of an amusement license unless the applicant failed to comply with the enumerated health and safety requirements. The mere fact that similar language existed in both the Code and the Golden ordinance does not render the Code violative of O'Connor's and the Theatres' constitutional rights. In distinguishing *ACORN*, the trial court wrote:

> Significantly, under Section 7–26, there is no restriction of first amendment activity. The only limitation imposed on theaters is the requirement of obtaining an amusement license prior to showing films. The evidence showed that Section 7–26 only prevented nonprofit organizations from paying a license fee. However, both nonprofit and commercial organizations had to comply with the safety codes, etc. Further, plaintiffs have not argued that the exemptions apply to them, and have not shown how the exemptions in any way affected the loss of their amusement licenses. In fact, the plaintiff-theaters obtained licenses from the City.

Thus, *ACORN* was not dispositive in the trial court's analysis. We agree with the trial court, and hold the challenged Code is not unconstitutionally vague.

## IV. DUE PROCESS

Citing *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 560, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448 (1975), and *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), O'Connor and the Theatres argue that the challenged ordinance violates Fourteenth Amendment due process requirements by failing to provide for speedy hearing and appeal of licensing decisions. Appellants' Brief at 37. Because *Southeastern Promotions* and *Freedman* involved prior restraints, they

do not apply to the case now before the court. In *Freedman*, the appellant sought to challenge the constitutionality of a motion picture censorship statute. The Court held that a noncriminal process requiring the prior submission of a film to a censor avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system. "First, the burden of proving that the film is unprotected expression must rest on the censor.... Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution." 380 U.S. at 58–59, 85 S.Ct. at 739. The *Freedman* requirements, however, are limited to prior restraints on protected expression. Because this case does not involve a prior restraint, there is no need to comply with the stricter *Freedman* due process procedures.

In *Southeastern Promotions*, a promoter of theatrical productions applied to a municipal board to present the musical production, "Hair," at a theater. The board concluded that the production was not "in the best interest of the community," and rejected the application. The promoter sought a preliminary injunction, then a permanent injunction permitting it to use the auditorium. After a three-day hearing on the content of the musical, the district court concluded that the production contained obscene conduct not entitled to First Amendment protection and denied relief. The Sixth Circuit affirmed, but the Supreme Court reversed, holding that when members of the board rejected the application to use a public forum, they accomplished a prior restraint under a system lacking in constitutionally required minimal procedural safeguards. 420 U.S. at 552, 95 S.Ct. at 1243. The Court applied the *Freedman* standards only after characterizing the action as a prior restraint. "We held in *Freedman*, and we reaffirm here, that a system of prior restraint runs afoul of the First Amendment if it lacks certain safeguards...." 420 U.S. at 560, 95 S.Ct. at 1247. Because the instant case does not

involve an issue of prior restraint, neither *Freedman* nor *Southeastern Promotions* applies herein.

O'Connor and the Theatres mistakenly argue that the hearing and appeal mechanisms of the Code are inadequate because they fail to protect their First Amendment rights. Section 7–39 of the Code provides the following due process protections: (1) notice; (2) the right to a full evidentiary hearing with the right to present testimony and cross-examine adverse witnesses; (3) written findings of fact and conclusions of law by the trier of fact; and (4) the opportunity to present evidence in mitigation if a violation is found. The section also provides for summary suspension procedures. These provisions are similar to those provided in *Barry v. Barchi*, 443 U.S. 55, 64–65, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979). In the context of this case, these protections provide the process due O'Connor and the Theatres.

## V. EQUAL PROTECTION

O'Connor and the Theatres claim that § 7–26 of the Code denies them equal protection of the law. Citing *Association of Community Orgs. for Reform Now, ("ACORN") v. Municipality of Golden, Colo.*, 744 F.2d 739, 749–50 (10th Cir. 1984), they contend that the challenged ordinance creates a classification distinguishing between groups or individuals providing entertainment for "patriotic, philanthropic, social service, health, welfare, benevolent, educational, fraternal, or religious purposes" and those providing entertainment for any other purpose. Appellants' Brief at 36. They argue the classifications created by § 7–26 inherently require a judgment of the content of the entertainment by the Director to determine if a license is required. Appellants' Brief at 36. Citing *Attorney General of New York v. Soto–Lopez*, 476 U.S. 898, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986), and *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), they further argue that, because the Code infringes a fundamental right (here, freedom of speech), the strict scrutiny analysis

applies and the government bears the burden of establishing that the provision is necessarily related to the government interest. Appellants' Brief at 34. We reject their argument.

We have already concluded that § 7–26 does not create content-based classifications that infringe upon the fundamental right of free speech. Thus, a strict scrutiny analysis is inapplicable here. In order to succeed with an equal protection challenge based on some other classification, O'Connor and the Theatres must show that they were treated differently than similarly situated licensees and that this different treatment lacked a rational basis. *See Rodriguez*, 411 U.S. at 17, 93 S.Ct. at 1288; *Landmark Land Co. of Oklahoma, Inc. v. Buchanan*, 874 F.2d 717, 722 (10th Cir. 1989). *See generally Lyng v. Castillo*, 477 U.S. 635, 638–39, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986) (the classification must be sustained if it is rationally related to a legitimate government interest). The trial court found that § 7–26 excepted only non-profit *organizations* from the requirement of paying a license fee, and that both non-profit and commercial organizations had to comply with the health and safety provisions. Further, the court noted that O'Connor and the Theatres did not argue that the exemptions applied to them and did not show how the exemptions were in any way related to the loss of their amusement licenses. O'Connor and the Theatres failed to demonstrate that they were treated differently than similarly situated licensees or that this treatment, if different, lacked a rational basis. Consequently, their equal protection claim fails.

## VI. O'CONNOR'S CLAIMS

O'Connor raises three contentions of error. First, he and the Empress claim that, based upon the doctrine of res judicata, they are entitled to judgment. Second, he contends he is entitled to nominal damages and reasonable attorney fees based upon his arrest for allegedly violating an uncon-stitutional ordinance. Third, he claims the trial court erred in "setting aside the stipulations of the parties" concerning his arrest and in holding that he abandoned his claims. *See* Appellants' Brief at 44–47. We address each contention individually.

First, we consider the effect, if any, of the doctrine of res judicata in O'Connor's case. O'Connor contends that he and the City litigated the constitutionality of §§ 7–11 to 7–40 in the criminal action before the Honorable Brian Campbell, Judge of the Denver County Court. The record indicates that in a hearing on a motion to dismiss case No. GV–141717, City and County of Denver v. James Riley, the county court judge apparently reviewed[11] the subject licensing scheme and granted the defendant's motion. In so doing, the judge stated:

> Well, as I've indicated on other occasions, I feel a certain amount of frustration because I'm sure that what ever decision is made will ultimately be appealed, and even if not appealed, actions pending in the District Court, Federal District Court, State District Court, to a certain extent or under any action taken by me, *it's advisory at best*, perhaps in reality totally moot. But I do think a good point was made by Mr. Gross the last time we were here and that is that defendants are—should not be required to have hang over them the threat of suit or the pending litigation, if it appears that the city's not going to prevail in its—its assertions. And on this basis I will go ahead and grant the ... defendant's motion to dismiss, for the reasons previously stated. Principally, because, while licensing may be appropriate under a certain situation, I have a hard time finding that this licensing scheme does not violate equal protection arguments. Thank you, gentlemen.

(Emphasis added.) In his brief, O'Connor states: "Judge Campbell held that the ordinance challenged herein violated equal protection rights as guaranteed by the Four-

---

**11.** The brief of the City explains that the case involved employees of the After Dark. The transcript does not identify Mr. Riley or explain the circumstances of his arrest or the charge against him.

teenth Amendment...." Appellants' Brief at 44. O'Connor contends that Judge Campbell's decision

> became a final judgment for purposes of applying the doctrine of res judicata.... O'Connor is thus entitled to an award of nominal damages and reasonable attorney fees on this basis. Additionally, O'Connor's employer, Plaintiff Empress Theater, is without question a privy in interest to that proceeding, and as such, is also entitled to that same relief.

Appellants' Brief at 44–45. We are not persuaded by this argument.

■■■■ Under proper circumstances, federal courts accord preclusive effect to issues decided by state courts. Res judicata and collateral estoppel not only reduce unnecessary litigation and foster reliance on adjudication, but also promote the comity between state and federal courts that has been recognized as a bulwark of the federal system. *Allen v. McCurry,* 449 U.S. 90, 95–96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). In the instant case, however, the very nature of the judge's remarks removes them from any res judicata consideration. The judge himself characterized the comments as "advisory at best." Second, the parties in the actions were neither the same nor did they stand in privity to one another. *See generally* J. Moore, J. Lucas & T. Currier, 1B *Moore's Federal Practice,* ¶ 0.411 (2d ed.1988). By citing no authority and by arguing the comments of the state judge have res judicata effect in this matter, O'Connor and the Theatres are grasping at straws.

Similarly, we find no merit to O'Connor's second contention. Because we hold the trial court did not err in determining the challenged ordinance did not violate O'Connor's constitutional rights, we necessarily hold the trial court did not err in determining that O'Connor was not entitled to nominal damages and attorney fees as a prevailing party.

■■■ Finally, O'Connor argues the trial judge "erred in setting aside the stipulations of the parties concerning the arrest of plaintiff O'Connor and in holding that O'Connor abandoned his claims." Appellants' Brief at 47. O'Connor misreads the record. In the Opinion issued by the trial court, the court noted that the parties stipulated in the pretrial order that Dennis O'Connor, an employee of the Empress Theater, was arrested and incarcerated overnight for violating the repealed § 7–26. At trial, his attorneys asserted that O'Connor sought only nominal damages and attorney fees under 42 U.S.C. § 1988 (1981). O'Connor was not present at the trial. He presented no testimony. The only evidence regarding O'Connor was the stipulation in the pretrial order. The trial court found that O'Connor failed to meet his burden of proof. "His unexplained absence at the trial connotes an abandonment of his claims." Relying on *Platt v. United States,* 163 F.2d 165, 168 (10th Cir.1947), the trial court concluded: "In the absence of the plaintiff at the trial, the stipulations of O'Connor's attorney are insufficient to establish any wrongdoing by the defendant." The trial judge did not err in determining that the stipulations of O'Connor's attorney are insufficient to establish any wrongdoing by the City.

■■■ Citing *United States v. Northern Colo. Water Conservancy Dist.,* 608 F.2d 422, 431 (10th Cir.1979), O'Connor seems to argue the court was bound by the facts in the stipulations, and the stipulations set forth facts sufficient to prove a cause of action. Appellants' Brief at 47–48. He argues he was entitled to judgment based upon the unconstitutionality of the scheme and the facts in the stipulations. Appellants' Brief at 48. O'Connor's argument is flawed in two respects. First, although the parties are bound by their stipulations, *Mills v. State Farm Mut. Auto Ins. Co.,* 827 F.2d 1418, 1422 (10th Cir.1987), the stipulations do not lock the court into entering judgment one way or another. As we stated in *Platt:*

> Parties may not stipulate the findings of fact upon which conclusions of law and the judgment of the court are to be based. Parties may by stipulation establish evidentiary facts to obviate the necessity of offering proof, but based thereon the court must itself find the

ultimate facts upon which the conclusions of law and the judgment are based. 163 F.2d at 168 (footnote omitted). Even if we accept O'Connor's argument that the trial court disregarded the stipulation of the parties, in some cases such action is not erroneous. We agree with the Seventh Circuit that a "party may not compel a court to decide a constitutional argument, especially one of some difficulty, by stipulation." *National Advertising Co. v. City of Rolling Meadows*, 789 F.2d 571, 574 (7th Cir.1986).[12] We know of no authority that compels a trial judge to entertain the purported case of a party who fails to appear for trial. The trial court did not err in determining that the stipulations of O'Connor's attorney are insufficient to establish any wrongdoing by the City.

## VII. PREVAILING PARTIES

During the trial, the Director of the Department testified that the City amended the Code as a direct result of the lawsuit. Consequently, O'Connor and the Theatres argue they are "prevailing parties" under 42 U.S.C. §§ 1983 and 1988 because their actions caused the City to take remedial action subsequent to the commencement of the lawsuit. They assert they are entitled to nominal damages and reasonable attorney fees in accordance with the "catalytic effect doctrine" referred to in *J & J Anderson, Inc. v. Town of Erie*, 767 F.2d 1469, 1475 (10th Cir.1985), and outlined in *Helms v. Hewitt*, 780 F.2d 367, 371 (3rd Cir.1986), *rev'd*, 482 U.S. 755, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987), and *Dawson v. Pastrick*, 600 F.2d 70, 79 (7th Cir.1979). Appellants' Brief at 42–43. We are not persuaded by their argument.

In *Luethje v. Peavine School Dist.*, 872 F.2d 352 (10th Cir.1989), we reiterated the two-prong test for fee eligibility as a prevailing party under 42 U.S.C. § 1988:

A civil rights plaintiff who does not receive a judicial determination on the merits but who obtains relief from a defendant qualifies as a "prevailing party" if she shows "(1) that [her] lawsuit is causally linked to securing the relief obtained and (2) that the *defendant's conduct in response to the lawsuit was required by law.*"

*Id.* at 354 (emphasis added) (quoting *J & J Anderson, Inc.*, 767 F.2d at 1473, 1475). *See also Foremaster v. City of St. George*, 882 F.2d 1485, 1488 (10th Cir.1989). In finding that O'Connor and the Theatres were not prevailing parties, the trial court stated: "Even though the City amended the [Code], we made no findings as to the constitutionality of the repealed ordinance. Further, we found the [City's] actions in revoking the plaintiffs' licenses were proper means of enforcing the public nuisance ordinance." We agree with the analysis of the trial court that O'Connor and the Theatres have the burden and fail to demonstrate the unconstitutionality of the Code. Because they fail to demonstrate that the revisions were required by law, they are not "prevailing parties" under 42 U.S.C. § 1988.

## CONCLUSION

We AFFIRM the judgment of the district court. O'Connor and the Theatres have standing to challenge the Code as it existed at the time the City took action against them. Under *Arcara*, this case does not trigger First Amendment analysis and protections. Resolution of the issues does not turn on prior restraint or heightened scrutiny under the vagueness, due process, or equal protection challenges. Further, we find no merit to O'Connor's additional contentions. Finally, we affirm the trial court's judgment that the Department's revocation of the licenses was a proper means of enforcing the public nuisance ordinance and O'Connor and the Theatres are

---

12. We distinguish *Rolling Meadows* from our circuit precedent in *L.P.S. v. Lamm*, 708 F.2d 537 (10th Cir.1983), wherein we stated: "'[W]e cannot overlook or disregard stipulations which are absolute and unequivocal. Stipulations of attorneys may not be disregarded or set aside at will.'" *Id.* at 539 (quoting *Northern Colorado*

*Water Conservancy Dist.*, 608 F.2d at 431). Even though a court may not overlook stipulations as a matter of course, no rule of law requires a court to base the resolution of the case on stipulations of the parties. The court determines the effect, if any, of the stipulations.

not prevailing parties for purposes of obtaining attorney's fees.

AFFIRMED.