**John DOE, Timothy Campbell, and Ferris J. Alexander, Appellants,**

**v.**

**CITY OF MINNEAPOLIS, a municipal corporation, Appellee.**

No. 88–5498.

United States Court of Appeals, Eighth Circuit.

Submitted June 14, 1989.

Decided March 12, 1990.

**613**

Randall D.B. Tigue, Minneapolis, Minn., for appellants.

C. Lynne Fundingsland, Minneapolis, Minn., for appellee.

Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and BROWN,* Senior Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

John Doe,[1] Timothy Campbell, and Ferris Alexander appeal from a district court[2] order upholding the constitutionality of a City of Minneapolis, Minnesota ordinance which: (1) prohibited the construction, use, design, or operation of a commercial building for the purpose of engaging in, or permitting persons to engage in, sexual harassment, injury, ridicule, or personal embarrassment. (Jt.App. at A.16).

---

* The HONORABLE JOHN R. BROWN, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

1. John Doe brings this case by means of a pseudonym in order to protect himself from

2. The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

activities which include high risk sexual conduct;[3] (2) specifically prohibited partitions between subdivisions with apertures designed or constructed to facilitate sexual activities between persons on either side of the partition; and (3) provided that booths or stalls have at least one side open so that the area inside is visible to persons in the adjacent public room if the booth is used to view motion pictures or other forms of entertainment. Alexander owns and operates six adult bookstores in Minneapolis, and Doe and Campbell are customers of those establishments. Before the district court, Doe, Campbell, and Alexander unsuccessfully sought declaratory and injunctive relief against the City under 42 U.S.C. § 1983 (1982). On appeal, they contend that the ordinance is both facially unconstitutional and unconstitutional as applied under the first and fourteenth amendments of the Constitution. We affirm the order of the district court.

On April 7, 1988, the City of Minneapolis enacted an ordinance[4] requiring that doors be removed from viewing booths in adult bookstores. The city council promulgated the ordinance to diminish the proliferation of contagious diseases spread by high risk sexual conduct that was shown to take place in these booths. In enacting the ordinance the council was particularly concerned with the spread of the Acquired Immune Deficiency Syndrome (AIDS) virus.[5]

Alexander owns and operates six of the eight adult bookstores operating within the city limits of Minneapolis. Each of these establishments have coin-operated booths offering a choice of either video entertainment or a live dance performance. There are 125 such booths in Alexander's stores.[6] All but six of the booths are designated single-person booths,[7] which measure between three feet square and four feet square. (Motion Hearing on Preliminary Injunction Tr. 151). Each booth has an opaque, full-length door which closes and locks.

Doe is a regular patron of the adult bookstores operated by Alexander, and has frequented the coin-operated video booths in these establishments. He prefers viewing videos in private, and claims that if the doors were removed, he would be intimidated from continuing to use the booths. (Jt. App. at A.17).

Campbell is also a customer of Alexander's adult bookstore viewing booths. He has patronized these booths since 1973. (Motion Hearing on Preliminary Injunction Tr. 45). Campbell is also the editor of the *G.L.C. Voice*, a local gay and lesbian newspaper, and a well-known gay activist. (Motion Hearing on Preliminary Injunction Tr.

---

3. The city council defined high risk sexual conduct as: (1) fellatio; (2) anal intercourse; or (3) vaginal intercourse with persons who engage in sexual acts in exchange for money. Minneapolis, Minnesota, Code of Ordinances § 219.510(1)(a), (b), and (c) (April 7, 1988).

4. Minneapolis, Minnesota, Code of Ordinances §§ 219.500–.530 (April 7, 1988) is set out in the Addendum to this opinion.

5. In a report on AIDS sent to the Minneapolis City Council, the Minnesota Department of Health stated, in part, that:

Human immunodeficiency virus (HIV) is a human retrovirus which infects and eventually destroys a particular set of cells in the human body that have a specific molecule receptor site ($CD_4$). These cells are located throughout the body and include cells in the immune system, the brain, and certain internal organs. The term acquired immunodeficiency syndrome (AIDS) refers to those clinical conditions where HIV has caused the destruction of cells in the immune system, such

that the body is unable to resist certain types of infections and cancers....

....

As of January 1, 1987, approximately 50,000 cases of AIDS have been reported in the United States. However, it is estimated that more than 1.5 million persons residing in the U.S. are infected with HIV. Most individuals who are currently infected are not aware that they have been infected or that they remain infected for life.

Statement of Fact Regarding Human Immunodeficiency Virus Infection, Minnesota Department of Health (Jt.App. at A.126).

6. This number includes booths located in Alexander's St. Paul bookstore.

7. This is in accord with a Hennepin County District Court order, *Henningsgard v. Bouza*, No. 761468, slip op. (Hennepin County District Court, September 1, 1982), which prohibits more than one person from occupying an individual booth.

60). He also contends that removal of the doors would restrict his use of the video booths. (Jt.App. at A.21).

Shortly after the ordinance was enacted, appellants obtained a temporary restraining order preventing the City from enforcing the ordinance. Appellants also sought a preliminary injunction and their action for such relief was consolidated with a trial on the merits. The district court, in a detailed order, denied appellants' prayer for a declaratory judgment that the ordinances were unconstitutional, dissolved its temporary restraining order, and denied appellants' motion for a preliminary and permanent injunction against enforcement of the ordinance. *Doe v. City of Minneapolis*, 693 F.Supp. 774, 785 (D.Minn.1988).

The Minneapolis City Council is empowered by law to "take such measures as [it] may in good faith declare the public safety and health to demand in case of pestilential or epidemic diseases or all danger from anticipated or impending pestilences or diseases or in case the sanitary conditions of the city shall be of such a character to warrant it." Minneapolis City Charter, ch. 14, § 3(c).[8] In an effort to combat the spread of contagious diseases caused by high risk sexual conduct, especially AIDS, the city council held public hearings, and compiled a record of live testimony, affidavits, and medical evidence concerning AIDS.[9]

The record before the council included: (1) affidavits by Minneapolis law enforcement officers stating that they had observed mutual masturbation, oral sex, and anal sex in adult bookstore viewing booths (Jt.App. at A.117, A.122–23); (2) support for the proposed ordinance from the Minnesota State Epidemiologist, the Director of Disease Prevention and Control for the Minnesota Department of Health, and the Minnesota Commissioner of Health, (Jt. App. at A.125); (3) scientific articles on the spread of the AIDS virus (Jt.App. at A.131–38, A.163–65); and (4) affidavits submitted by officials from Marion County, Indiana, (Jt.App. at A.155–62).[10]

From this record, the council concluded that the design of certain buildings was conducive to the spread of communicable diseases, and that these buildings presented a danger to the persons frequenting such buildings and "to the public health, safety and welfare of the community," *infra* § 219.500, in general. In so doing, the council took special note of AIDS, due to its irreversible and uniformly fatal nature, and found that it was associated with high risk sexual conduct and of particular danger to persons in the community. To combat the threat posed by such high risk conduct the council enacted the ordinance challenged in this case.

### I.

Appellants first argue that the ordinance is unconstitutional as applied to Doe and Campbell. They contend that the ordinance will have the effect of substantially limiting the availability of sexually explicit adult entertainment in violation of the first and fourteenth amendments to the Constitution.[11]

---

8. This section concerns the special powers and duties of the Board of Public Welfare in the City of Minneapolis. This Board was abolished in 1975 and all its duties, power, and authority were transferred to the Minneapolis City Council. 1974 Minn. Laws Ch. 191.

9. This record is reproduced in the Joint Appendix at A.109–90.

10. The Minneapolis ordinance was patterned after a similar one enacted by Marion County, Indiana. The Marion County ordinance was upheld by the Seventh Circuit in *Berg v. Health & Hosp. Corp.*, 865 F.2d 797 (7th Cir.1989). In these affidavits Robert Jones, Acting Chief of the Bureau of Disease Prevention/Health for Marion County, traced the origins of the Marion County Ordinance and cited the need for curtailing incidents of anonymous high risk sexual activity as the impetus behind that ordinance (Jt. App. at A.155–59), and Lt. Thomas Rogers of the Indianapolis Police Department recounted his experience with adult bookstore booths, specifically noted their unsanitary nature, and stated that officers of his department had observed public indecency, oral sex, and anal sex in these areas (Jt.App. at A.160–62).

11. Appellants also maintain that the ordinance infringes on their rights to privacy and anonymity. We agree with the district court's determination that the appellants do not have a privacy right to watch the material conveyed to the viewing booths in seclusion. *See* 693

■ The City does not contend that the video entertainment or live dancing involved in this matter are obscene and, accordingly, as did the district court, we presume that materials in question are afforded first amendment protection. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 756, 96 S.Ct. 1817, 1822, 48 L.Ed.2d 346 (1976). Therefore, we assume that Doe and Campbell have a protectable first amendment right to view this entertainment.[12]

■ This ordinance does, by removing doors, place a manner restriction on how protected speech is received by Doe and Campbell. Although restrictions on protected speech are presumed to be unconstitutional if their purpose is to restrict speech because of its content, *City of Renton v. Playtime Theatres,* 475 U.S. 41, 46–47, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986), protected speech can be subject to time, place, and manner restrictions. *Ward v. Rock Against Racism,* — U.S. ——, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative*

*Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984); *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968).

■ In its detailed opinion, the district court carefully considered the claims raised by Doe, Campbell, and Alexander, and we find this analysis to be persuasive. The court considered the ordinance under the factors set forth in *City of Watseka v. Illinois Pub. Action Council,* 796 F.2d 1547, 1552 (7th Cir.1986), *affirmed,* 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972 (1987). We believe, however, in light of the Supreme Court's decision in *Ward v. Rock Against Racism,* 109 S.Ct. at 2753, decided after the district court's decision in this case, that the *Ward* analysis should govern our review.[13] As the district court in this case rejected a first amendment claim, we review de novo. *See Bose Corp. v. Consumers Union of United States,* 466 U.S. 485, 498–511, 104 S.Ct. 1949, 1958–65, 80 L.Ed.2d 502 (1984).[14]

In *Ward,* the Court set out the appropriate standard for reviewing restrictions on the time, place, or manner of speech:

F.Supp. at 782–83. The right to view public entertainment in the seclusion of a closed booth simply falls outside the ambit of the personal intimacies of the home, the family, marriage, parenthood, procreation, and child rearing. *See generally Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 65, 93 S.Ct. 2628, 2639, 37 L.Ed.2d 446 (1973). We are also not convinced, again agreeing with the district court, that appellants have a first amendment right to anonymity in their viewing selections. *See* 693 F.Supp. at 783. However, assuming arguendo that such a right does exist in this case, we believe that, under the facts presented in the record, the appellants anonymity will not be significantly impinged upon by the ordinance. With or without doors, the viewing booths have clearly posted what material is shown inside them (Motion Hearing on Preliminary Injunction Tr. 10, 27–28). Accordingly, the appellants choice of viewing is publicly made and will be equally obvious with or without doors on booths.

12. This right, however, is not absolute. For instance, appellants do not have a right to view this public entertainment in seclusion. *See supra* note 11. Furthermore, although appellants have a protectable constitutional right to view the material being shown in the booths, "we cannot agree that the interest in simultaneously engaging in sexual activity is similarly protect-

ed." *Ellwest Stereo Theaters v. Wenner,* 681 F.2d 1243, 1248 (9th Cir.1982).

13. As *Ward* controls, it is not productive to further consider what differences there may be between *Ward* and the test applied by the district court.

14. This case must be distinguished from those in which the district court finds that a law violates the first amendment, for there the circuits are split as to whether the review is de novo or under the clearly erroneous standard. *See Don's Porta Signs v. City of Clearwater,* 485 U.S. 981, 981–82, 108 S.Ct. 1280, 1280–81, 99 L.Ed.2d 491 (1988) (White, J., dissenting from denial of certiorari). *Compare Don's Porta Signs v. City of Clearwater,* 829 F.2d 1051, 1053–54 n. 9 (11th Cir.1987), *cert. denied,* 485 U.S. 981, 108 S.Ct. 1280, 99 L.Ed.2d 491 (1988) *and Lindsay v. City of San Antonio,* 821 F.2d 1103, 1107–08 (5th Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988) *with Daily Herald Co. v. Munro,* 838 F.2d 380, 383 (9th Cir.1988) *and Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth.,* 767 F.2d 1225, 1228–29 (7th Cir.1985). We add that while some of the district court analysis resulted in factual findings that are not relevant to our discussion, insofar as the findings are relevant to our analysis, we have seen none that we conclude were clearly erroneous.

[T]he government may impose reasonable restrictions on the time, place, or manner of protected speech, provided restrictions "are [1] justified without reference to the content of the regulated speech, that they are [2] narrowly tailored to serve a significant governmental interest, and that they [3] leave open ample alterative channels for communication of the information.

*Id.* 109 S.Ct. at 2753 (quoting *Community for Creative Non–Violence,* 468 U.S. at 293, 104 S.Ct. at 3069); *see Frisby v. Shultz,* 487 U.S. 474, 108 S.Ct. 2495, 2499, 101 L.Ed.2d 420 (1988); *Perry Educ. Ass'n v. Perry Local Educ. Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983); *Virginia Pharmacy,* 425 U.S. at 771, 96 S.Ct. at 1830. Since we see the ordinance as a restriction on protected speech, we now review it under the *Ward* analysis.

### A.

■ "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward,* 109 S.Ct. at 2754. In this inquiry the controlling consideration is the government's purpose. *Id.* "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* As long as the governmental regulation of expression can be "justified without reference to the content of the regulated speech," it can be considered content-neutral. *Id.* (emphasis removed) (quoting *Community for Creative Non–Violence,* 468 U.S. at 293, 104 S.Ct. at 3069).

The city council's record makes clear that its decision to remove doors from viewing booths in adult bookstores was aimed specifically at high risk sexual conduct and the resultant spread of the AIDS virus in Minneapolis. We see nothing in the city council's or trial court's record to suggest that the council disagreed with the content of the videos shown or the dancing performed. Furthermore, we are satisfied that the ordinance's impact on individuals wishing to view sexually explicit material in closed booths is simply an incidental effect of the council's fight against AIDS. Accordingly, under the standard set by *Ward,* we conclude this ordinance is content-neutral.

### B.

For the ordinance to be considered valid it must also be narrowly tailored to serve a significant governmental interest. *Ward,* 109 S.Ct. at 2756; *Community for Creative Non–Violence,* 468 U.S. at 293, 104 S.Ct. at 3069; *Virginia Pharmacy,* 425 U.S. at 771, 96 S.Ct. at 1830.

Initially we must ascertain whether the city council was pursuing a significant governmental interest in promulgating the ordinance. To establish such an interest, the city must show that the evidence the council relied upon in formulating the ordinance "is reasonably believed to be relevant to the problem" that the government is addressing. *Renton,* 475 U.S. at 51–52, 106 S.Ct. at 931. "To have [such a] determination sustained against constitutional attack, a legislature is not bound to create an evidentiary record that would pass muster on plenary judicial review of legislation's necessity and fitness to achieve desired results." *Wall Distrib. v. City of Newport News,* 782 F.2d 1165, 1169 (4th Cir.1986). Judicial review of such a determination "goes only to whether the legislative determination of justification and fitness is not facially without factual support, hence not arbitrary and capricious." *Id.* As noted earlier, the council's record contains abundant evidence of the threat posed by AIDS to public health. Since we are satisfied that the council's justification for the ordinance is firmly supported by evidence in its record, we are satisfied that it serves to advance a significant governmental interest by combating the spread of AIDS virus.[15]

---

**15.** Recent Supreme Court decisions provide some examples of significant governmental in-

The City must also show that the ordinance is narrowly tailored to the goal of combating the spread of AIDS. The fact that the ordinance must be narrowly tailored does not mean that it must do so through the least-restrictive or least-intrusive means available. The Supreme Court in *Ward* stated that "the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' " 109 S.Ct. at 2758 (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985)). The ordinance easily satisfies this requirement.

To satisfy this requirement, the City must first establish support for its position that high risk activity leads to transmission of the AIDS virus. The United States Surgeon General's list of high risk behavior that can lead to the spread of the AIDS virus is consistent with the ordinance's definition of high risk sexual conduct. *Understanding AIDS* 3 (HHS Publication No. (CDC) HHS–88–8404) (Jt.App. at A.168); *see also Surgeon General's Report on Acquired Immune Deficiency Syndrome* 5 (Oct. 22, 1986) (Jt.App. at A.174). Furthermore, the ordinance's definition is supported by the Minnesota State Epidemiologist, (Jt.App. at A.125), the Director of Disease Prevention & Control for the Minnesota Department of Health, (Jt.App. at A.125), the Minnesota Commissioner of Health, (Jt.App. at A.125), and the Medical Director of the Hennepin County Sexually Transmitted Disease Clinic, (Motion Hearing on Preliminary Injunction Tr. 111). Accordingly, we are satisfied that the City has established that high risk conduct, as defined by the ordinance, leads to transmission of the AIDS virus.

With this established, the City must show that high risk activity takes place in bookstore viewing booths. Appellants argue that there is insufficient evidence to support such a conclusion. They argue that: (1) the booths are too small; (2) the testimony of Officer Dean Severson of the Minneapolis Police Department is undercut because the Minneapolis Police have been prohibited from opening booths since 1982, and thus any activity seen must have occurred in open booths; (3) Officer Severson's testimony was incorrect concerning the numbers of arrests made in adult bookstores over the last two years; (4) the single-person rule set in *Henningsgard,* No. 761468, slip. op., see *supra* note 7, is working; (5) Eve White, a dancer at Alexander's stores, has never seen two people in an individual booth; and (6) Alexander has a video monitoring system and alarm system to prevent two people from occupying one booth. We have carefully considered these arguments and, in light of the weight of contrary evidence in the record before us, are not persuaded.

The affidavits and testimony of Minneapolis law enforcement officers, health care experts, and appellant Campbell, clearly establish that booths in adult bookstores are used for fellatio and anal intercourse, both deemed high risk sexual activity by the ordinance. Officer Severson testified to seeing hundreds of instances of sodomy, indecent exposure, and prostitution in the booths of adult bookstores over the past six years. (Motion Hearing on Preliminary Injunction Tr. 156–57). Officer Ronald Christianson, also a member of the Minneapolis Police Department, in an affidavit submitted to the council, stated that the booths in the adult bookstores in his precinct were unsanitary and provided opportunities for indecent exposure, oral sex, and anal sex. (Jt.App. at A.122–24).

At trial, Dr. Margaret Simpson, Medical Director of the Hennepin County Sexually

terests recognized by the Court. In *Ward* the Court held that the City of New York had "a substantial interest in protecting its citizens from unwelcome noise." 109 S.Ct. at 2756 (quoting *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 806, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772 (1984)). In *Community for Creative Non–Violence,* the Court found that the government had a substantial interest "in maintaining the parks in the heart of our Capital in an attractive and intact condition." 468 U.S. at 296, 104 S.Ct. at 3070. In *Frisby,* the Court found that the protection of residential privacy was a significant governmental interest. 108 S.Ct. at 2502.

Transmitted Disease Clinic, testified that, in the course of her duties, she had counseled hundreds of gay men, and that the clinic, under her guidance, had counseled thousands of gay men. (Motion Hearing on Preliminary Injunction Tr. 111). Based upon her contact with these men, she stated that high risk sexual activity, including oral and anal sex, takes place in adult bookstores and entertainment centers. (Motion Hearing on Preliminary Injunction Tr. 112). Further, she voiced her support for the ordinance as an appropriate attempt to discourage high risk sexual activity. (Motion Hearing on Preliminary Injunction Tr. 115).

Appellant Campbell, who is familiar with the sexual habits of the gay community (Motion Hearing on Preliminary Injunction Tr. 52), provided further insight into the behavior taking place in closed viewing booths. Campbell testified that the booths were "a physical setup that [could] be converted to that [sexual] use. The bookstore cubicle is best for watching a movie in, but an alternative use is highly possible and frequently seen in my experiences for uncommitted, anonymous pseudo sex [sic]." (Motion Hearing on Preliminary Injunction Tr. 67). Campbell also stated that bookstore sex has a legitimate function in that "[i]t provides people with an opportunity to try it and see if they like it, to try a form of pseudosex to get their toes in the water." (Motion Hearing on Preliminary Injunction Tr. 82).[16] Campbell concluded that the new ordinance would not decrease the number of sexual encounters considered to be high risk, but would only push them into more dangerous situations. (Motion Hearing on Preliminary Injunction Tr. 84).

The net result of this testimony is clear; sexual encounters occur in bookstore booths. (Motion Hearing on Preliminary Injunction Tr. 61–62).[17] Further, we are not convinced by appellants' alternative ar-

gument that there has been no evidence presented to show that this behavior also takes place in booths designed for viewing dancing. The health risk results from the booth being closed, not from the material viewed.

Finally, to satisfy the narrow tailoring requirement, the City must show that the ordinance will serve to reduce high risk sexual conduct in the bookstore viewing booths. We are satisfied that the ordinance will reduce this behavior in two ways. First, it will discourage high risk activity by exposing the viewing booths to the open view of a public room and, second, if the high risk activity continues in the booths, it will assist law enforcement officials in enforcing public indecency and sodomy laws. Appellants contend that, at best, the ordinance will simply shift the location of high risk activity and could actually increase it by forcing individuals so inclined to go to places where high risk activity would be more likely to occur. Although we recognize that this ordinance cannot by itself prevent the spread of the AIDS virus in Minneapolis, we believe that it will serve to reduce high risk conduct leading to the spread of AIDS. Further, we believe that this is a situation where a "city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Renton*, 475 U.S. at 52, 106 S.Ct. at 931 (quoting *Young v. American Mini Theatres*, 427 U.S. 50, 71, 96 S.Ct. 2440, 2453, 49 L.Ed.2d 310 (1976) (plurality)).

Therefore, we are satisfied that the City's interest in public health, specifically fighting the spread of the AIDS virus, would not be achieved as effectively without this ordinance, and thus it is narrowly tailored to serve a significant governmental interest.

---

**16.** Although Campbell never clearly defined what he meant by pseudosex, his testimony implied that this would include oral sex, but not anal sex. (Motion Hearing on Preliminary Injunction Tr. 82).

**17.** The problem of high risk sexual activity occurring in enclosed bookstore viewing booths has been noted by three other circuits in upholding open-door ordinances similar to the Minneapolis ordinance. *See Berg*, 865 F.2d at 803; *Wall Distrib.*, 782 F.2d at 1169; *Ellwest*, 681 F.2d at 1246.

## C.

The third *Ward* requirement necessitates that the City show that the ordinance leaves "open ample alternative channels of communication," 109 S.Ct. at 2760, of sexually explicit material. This burden is easily met. The ordinance in no way prohibits or regulates the time or place for viewing videos or live dancing in booths. It simply requires that the booths have one side facing a public room, have no apertures in their walls, and prohibits doors on the booths. Alexander can provide, and Campbell and Doe can watch, except in closed booths, videos or live dancing whenever and wherever they desire. Further, the ordinance in no way affects the content of the dancing or videos. The quantity of speech may be reduced because the new open booths may not be as profitable for Alexander, but that is an economic decision for him to make. *Cf. Renton*, 475 U.S. at 54, 106 S.Ct. at 932 (noting that an adult theater owner had a first amendment right to display sexually explicit films, but did not have a first amendment right to make a profit). In sum, we agree with the seventh circuit's conclusion that "for First Amendment purposes, an open booth is the equivalent to a closed booth, so far as viewing materials is [sic] concerned." *Berg*, 865 F.2d at 803. Therefore, we conclude that ample alternative channels for communicating sexually explicit videos and dancing are left open by the ordinance. *See id.; Wall Distrib.*, 782 F.2d at 1169.

In conclusion, we hold, under the *Ward* analysis, that the City's high risk sex ordinance is a valid manner restriction of expression under the first amendment.

## II.

Appellants next argue that the ordinance would constitute a substantial infringement upon appellant Alexander's first amendment right to exhibit motion picture films by depriving him of the only method by which he can profitably operate his entertainment business. Appellants argue that the ordinance, by prohibiting doors on booths, would preclude Alexander from excluding non-paying customers from viewing proffered entertainment. To support this position they cite the trial testimony of James Hafiz, operator of the Faust Theater in St. Paul, Minnesota which has a booth system similar to Alexander's. Hafiz testified that for a short time period he was required to remove the doors from his viewing booths, and that during that time his business suffered a 66 percent drop in revenue. (Motion Hearing on Preliminary Injunction Tr. 88). Appellants maintain that if the ordinance at issue is enforced it would force Alexander to close his bookstores for economic reasons.

The district court was not persuaded by this argument, and concluded, citing *American Mini Theatres*, 427 U.S. at 78, 96 S.Ct. at 2456 (Powell, J., concurring), that, for the purposes of first amendment inquiry, the proper focus of the court was the ordinance's impact on the freedom of expression, not on economic conditions.

On appeal, appellants first argue that the standard used by the district court is incorrect. They maintain that since *American Mini Theatres* involved a zoning ordinance which concerned only the location of new adult business, and since the Court in that case held that the economic impact of locating an adult business in one location rather than another was minimal, its reasoning should not be applied to the instant case. Rather, they choose to characterize this case as one of discriminatory taxation of first amendment activity.

Although it is true that the Supreme Court has traditionally struck down taxes which served to discriminate against first amendment activity,[18] we simply do not see

---

**18.** Appellants cite several of these cases. *See, e.g., Arkansas Writers' Project v. Ragland*, 481 U.S. 221, 234, 107 S.Ct. 1722, 1730, 95 L.Ed.2d 209 (1987) (rejecting an Arkansas tax on the receipt of tangible personal property, but excluding newspapers and religious, professional, trade and sports journals); *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 590, 103 S.Ct. 1365, 1374, 75 L.Ed.2d 295 (1983) (invalidating a Minnesota special tax on the cost of ink and paper used in producing publications on first amendment grounds); *Grosjean v. American Press Co.*, 297 U.S. 233, 251, 56 S.Ct. 444, 449, 80 L.Ed. 660

this case as one of discriminatory taxation. Unlike the numerous tax cases cited by appellants, which involved direct imposition of economic taxes or penalties, this case is one of alleged indirect economic disadvantage. Accordingly, we agree with the district court and take guidance from Mr. Justice Powell's analysis in *American Mini Theatres.*

In that case the Court found that a city zoning ordinance that restricted the location of adult theatres did not implicate the Constitution. *American Mini Theatres,* 427 U.S. at 61–63, 96 S.Ct. at 2448–49. Mr. Justice Powell concurred in the result, noting that he viewed the zoning ordinance as an example of an innovative land-use regulation. *Id.* at 73, 96 S.Ct. at 2453 (Powell, J., concurring). In his opinion, he stated that:

> The inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of this ordinance upon freedom of expression. This prompts essentially two inquiries: (i) Does the ordinance impose any content limitation on the creators of adult movies or their ability to make them available to whom they desire, and (ii) does it restrict in any significant way the viewing of these movies by those who desire to see them?

*Id.* at 78, 96 S.Ct. at 2456. The ordinance before us satisfactorily meets both of these inquiries. It is clear that this ordinance, focusing on public health, neither impacts the makers of adult movies in the content of their films or in how they are made available, nor restricts significantly the viewing of these movies. Rather, by prohibiting apertures and doors on individual viewing booths, it simply regulates one way in which this entertainment is received, and in no way impacts the time, place, or content of the material conveyed.

Finally, we note again that the ordinance may adversely impact Alexander's viewing booth revenue, but any actions taken by him beyond removing booth doors and repairing apertures in booth walls remains

within his purview as a simple economic decision. Alexander has a first amendment right to display his videos and dancers, but he does not have a guaranteed right to make a profit. *See Renton,* 475 U.S. at 54, 106 S.Ct. at 932. As the Supreme Court stated in *Renton,* "the First Amendment requires only that [the city] refrain from effectively denying respondents [adult theater owners] a reasonable opportunity to open and operate an adult theater within the city." *Id.* The ordinance does not deny Alexander a reasonable opportunity to own and operate his bookstores in Minneapolis; it simply prohibits him from providing such entertainment to closed booths.

### III.

Appellants also maintain that the ordinance denies appellant Alexander equal protection because it applies only to adult bookstores. They argue that since section 219.520(2)(b)(3) of the ordinance limits its application to locations "used for the viewing of motion pictures or other forms of entertainment," while specifically excluding hotels, motels, apartment complexes, condominiums, and rooming houses, places, section 219.520(3), where unsafe sexual practices are also taking place, no compelling state interest exists for the classification set forth in the ordinance.

At trial, appellants advanced a similar equal protection argument, which the district court rejected. The court dismissed this argument concerning bathhouses, massage parlors, and saunas because they are arguably covered by section 219.510(3) of the ordinance, which defines "booths, stalls, or partitioned portions of a room or individual rooms," as including "enclosures specifically offered to persons for a fee or as an incident to performing high risk sexual conduct." As to the specific exclusion of hotels, apartment complexes, condominiums, and rooming houses contained in section 219.520(3), the court stated that the fact that high risk sexual activity might take place in these establishments did not lead to the conclusion that appellant Alex-

(1936) (striking down a two percent license tax on the gross receipts of the sale of all advertis-

ing in newspapers with a weekly circulation slightly less than 20,000 per week).

ander was denied equal protection. It noted the difficult nature of the health problem presented by the AIDS virus and concluded that the severity of this problem justified giving the City a reasonable opportunity to deal with it.

We agree with the district court's analysis of the ordinance.[19] The city council, after careful review and consultation with health professionals, crafted an ordinance to combat the spread of the AIDS virus in Minneapolis. To be constitutionally valid, such an ordinance must be specific so as to avoid arguments that it is too vague. *See American Mini Theatres,* 427 U.S. at 58–61, 96 S.Ct. at 2446–48. Accordingly, the council limited the application of its ordinance in section 219.510(3) to commercial establishments providing clear evidence of high risk sexual activity. All similarly situated commercial establishments were treated the same. There is no indication that the council invidiously singled out adult bookstores or sought to restrict first amendment activities. Accordingly, we conclude that Alexander was not denied equal protection under the law.

## IV.

Therefore, for the reasons stated above, we affirm the judgment of the district court dissolving its temporary restraining order concerning enforcement of the ordinance and denying appellants' motion for a preliminary and permanent injunction.

## ADDENDUM

### AN ORDINANCE of the CITY OF MINNEAPOLIS

Amending Section 219 of the Minneapolis Code of Ordinances relating to contagious diseases

ARTICLE V. High Risk Sexual Conduct

The City Council of the City of Minneapolis do[es] ordain as follows:

That Section 219 of the above entitled ordinance be amended to read as follows:

§ 219.500 FINDINGS. It is hereby found that there are within the City of Minneapolis commercial premises, buildings and structures, or parts thereof, which, by reason of the design and use of such premises, buildings or structures are conducive to the spread of communicable disease of danger to persons frequenting such premises, buildings and structures, and to the public health, safety and welfare of the community. The health, safety and welfare of all persons in the City of Minneapolis must be protected through the application and enforcement of standards regulating such premises, buildings and structures, in order to eliminate the possibility of the spread of, or infection by, contagious disease. The sexually transmittable disease of Acquired Immune Deficiency Syndrome, currently found to be irreversible and uniformly fatal, is found to be of particular danger to persons in this community. The incidence of this disease is found to occur in discernible population groups. The risk factors for obtaining or spreading the disease are associated with high-risk sexual conduct. The commercial premises, buildings and structures where persons are placed at risk of infection from this disease or other communicable diseases facilitated by their design or use for high-risk sexual conduct are in need of regulation, and of establishment of minimal standards for the prevention of the spread of this disease and other communicable diseases for the protection of the public health, safety and welfare of the community.

§ 219.510 DEFINITIONS.

(1) The term "high risk sexual conduct" means:

---

19. Furthermore, we are not convinced that the City must show a compelling state interest to justify the ordinance on equal protection grounds. The ordinance does not have an explicit classification scheme and it is not targeted at establishments that sell or provide first amendment material. Instead, it is crafted to apply *to commercial establishments where high risk sexual activity is known to occur on a* frequent basis, and those establishments that, by design or use, promote such behavior. The fact that the ordinance excludes hotels, motels, apartment complexes, condominiums, and rooming houses, is not determinative of appellants' equal protection argument because there is no showing that these places are similarly situated with the bookstore booths in appellant Alexander's stores.

(a) fellatio;

(b) anal intercourse;

(c) vaginal intercourse with persons who engage in sexual acts in exchange for money.

(2) The term "hazardous site" means any commercial premises building or structure, or any part thereof, which is a site of high risk sexual conduct.

(3) The phrase "booths, stalls, or partitioned portions of a room or individual rooms" means: (a) enclosures specifically offered to persons for a fee or as an incident to performing high risk sexual conduct; or (b) enclosures which are part of a business operated on the premises which offers movies or other entertainment to be viewed within the enclosure, including enclosures wherein movies or other entertainment is dispensed for a fee. The phrase "booths, stalls, or partitioned portions of a room or individual rooms" does not mean enclosures which are private offices used by the owners, managers, or persons employed on the premises for attending to the tasks of their employment, and which are not held out to the public or members of the establishment for hire or for a fee or for the purpose of viewing movies or other entertainment for a fee, and are not open to any persons other than employees.

(4) The phrase "doors, curtains or portal partitions" means full, complete, nontransparent closure devices through which one cannot see or view activity taking place within the enclosure.

(5) The phrase "open to an adjacent public room so that the area inside is visible to persons in the adjacent public room" means either the absence of any "door, curtain or portal partition" or a door or other device which is made of clear, transparent material such as glass, plexiglass or other similar material meeting building code and safety standards, which permits the activity inside the enclosure to be viewed or seen by persons outside the enclosure.

(6) The words "Commissioner of Health" mean the City of Minneapolis Commissioner of Health.

## § 219.520  BUILDING STANDARDS.

(1) No commercial building, structure, premises or part thereof, or facilities therein, shall be so constructed, used, designed or operated for the purpose of engaging in, or permitting persons to engage in, sexual activities which include high-risk sexual conduct.

(2) No person shall own, operate, manage, rent, lease, or exercise control of any commercial building, structure, premises, or portion or part thereof, which contains:

(a) Partitions between subdivisions of a room, portion or part of a building, structure or premises having an aperture which is designed or constructed to facilitate sexual activity between persons on either side of the partition.

(b) Booths, stalls, or partitioned portions of a room, or individual rooms, used for the viewing of motion pictures or other forms of entertainment, having doors, curtains or portal partitions, unless such booths, stalls, partitioned portions of a room, or individual rooms so used shall have at least one side open to an adjacent public room so that the area inside is visible to persons in the adjacent public room. Such areas shall be lighted in a manner that the persons in the area used for viewing motion pictures or other forms of entertainment are visible from the adjacent public rooms, but such lighting shall not be of such intensity as to prevent the viewing of the motion pictures or other offered entertainment.

(3) The standards as set forth in this section shall not apply to buildings, structures and premises which are lawfully operating as hotels, motels, apartment complexes, condominiums or rooming houses.

## § 219.530  POWERS OF THE COMMISSIONER OF HEALTH.

(1) In exercising powers conferred by this or any other section of this Code relating to communicable diseases, the Board of Health and the Commissioner of Health shall be guided by the most recent instructions, opinions and guidelines of the Center for Disease Control of the United States Department of Health and Human Services

which relate to the spread of infectious diseases. Any regulations which are adopted by the Board of Health which relate to controlling the spread of infectious diseases shall also apply in exercising the powers authorized by this Code.

(2) In order to ascertain the source of infection and reduce its spread, the Commissioner of Health, and persons under the Commissioner's direction and control, shall have full power and authority to inspect or cause to be inspected, and to issue orders regarding any commercial building, structure or premises, or any part thereof, which may be a site of high risk sexual conduct. If the Commissioner of Health determines that a hazardous site exists, the Commissioner of Health shall declare it to be a public health hazard and public health nuisance and shall then:

(1) Notify the management, owner or tenant of the premises that the Commissioner has reasonable belief that the premises, building or structure is a hazardous site.

(2) Issue warnings to the management, owner or tenant of the premises stating the reasons for the Commissioner's belief that the premises, building, or structure is a hazardous site.

(3) Once such notice and warnings have been issued, the Commissioner, or the Commissioner's appointee shall proceed as follows:

(a) After the management, owner or tenant of the premises has been notified in writing as to the basis of the Commissioner's determination, the management, owner or tenant shall have ten (10) days to request a hearing before the Commissioner or the Commissioner's appointee for a determination as to the existence of such hazardous site. If the management, owner or tenant of the premises does not request a hearing within ten (10) days of the notice, the Commissioner shall then cause the premises to be posted with a warning advising the public that the premises have been declared a hazardous site. The Commissioner of Health shall cause orders to be issued to the management, owner or tenant of the premises constituting the hazardous site to take corrective measures to prevent high risk sexual conduct from taking place within the premises.

(b) If the management, owner or tenant of the premises requests a hearing, the hearing shall be held before the Commissioner or the Commissioner's appointee at a date not more than thirty (30) days after demand for a hearing. After considering all evidence, the Commissioner or the Commissioner's appointee shall make a determination as to whether the premises constitute a hazardous site. The Commissioner shall then issue a decision based upon all evidence presented. If the Commissioner or the Commissioner's appointee makes a determination that the premises constitute a hazardous site, the Commissioner shall then issue an order and cause the premises, building or structure to be posted with a warning advising the public that the premises have been declared a hazardous site.

(4) If, within thirty (30) days from issuance of the orders to the management, owner or tenant of the hazardous site, the Commissioner of Health determines that such corrective measures have not been undertaken, then the Commissioner of Health may order the abatement of the hazardous site as a public nuisance, which shall be enforced by mandatory or prohibitory injunction in a court of competent jurisdiction; or may secure a court order for the closure of the premises constituting the "hazardous site" until the premises, building, or structure is in compliance with the standards set forth in § 219.520.

(5) Any person who removes, destroys, or defaces warnings posted on premises shall be guilty of a misdemeanor.

Minneapolis, Minnesota, Code of Ordinances §§ 219.500–.530 (April 7, 1988).